*229
 
 OPINION OF THE COURT
 

 Smith, J.
 

 In this appeal, we are asked to decide whether defendant doctors owed a duty of care to plaintiff, a friend of a woman they treated for infectious meningitis who subsequently contracted the disease, based on the doctors’ alleged negative answer to plaintiffs question whether she needed treatment after being in close contact with her friend. We find that the duty the doctors owed their patient did not extend to plaintiff.
 

 In the early morning hours of December 24, 1989, plaintiff Mary Ann McNulty was awakened by a telephone call from Louis Eschevaria, the boyfriend of her friend, Robin Reda, who stated that he had gone to Reda’s apartment to find that she had vomited everywhere and was unresponsive. Both plaintiff and Reda were registered nurses, Reda at defendant Jacobi Hospital/Bronx Municipal Hospital Center, which is part of defendant New York City Health and Hospitals Corporation, and plaintiff at defendant Montefiore Medical Center. Upon arriving at Reda’s apartment about 30 minutes later, plaintiff called 911 and Reda’s father. An ambulance transported Reda to the emergency room of Jacobi Hospital, where she was initially treated by Dr. Beilin.
 

 Reda was in the emergency room for about three hours, and plaintiff was at her bedside for one hour. Reda’s father and her brother were also at the emergency room. Dr. Beilin, Reda’s treating physician, spoke to the family members, plaintiff and Eschevaria at least two times and informed them that Reda had meningitis, and that she needed to be in isolation. Reda’s family then requested that she be transferred to defendant
 
 *230
 
 Hospital of Albert Einstein College of Medicine so she could be under the care of her family physician, defendant Dr. Robert A. Shimm, who was in private practice and had admitting privileges at Einstein. With others present, plaintiff then asked Dr. Beilin whether Reda had a contagious form of meningitis, and whether plaintiff needed to be treated, since she was in close contact with Reda. Dr. Beilin simply “shrugged his head.” Plaintiff and Eschevaria then agreed that they would ask the doctors at Einstein whether they would need to be treated.
 

 Plaintiff then went to Einstein where she saw Reda for a few minutes, went home and returned around 8:30 p.m. During her initial visit to Einstein, plaintiff approached Dr. Shimm, told him that she had brought Reda to the emergency room and had been in close contact with her all morning, and asked whether he felt that she needed to be treated. Dr. Shimm allegedly answered that she did not need treatment. On December 25, plaintiff went to see Reda again, spending about 30 minutes with her. On this visit, plaintiff saw defendant Dr. Herbert Tanowitz in Reda’s room. Plaintiff asked him if she needed to be treated, and he also answered no. That was the extent of the conversation. On December 26, plaintiff spent about an hour with Reda. The next day, plaintiff went to work where she spoke to a surgeon colleague about her experience. Plaintiff asked the surgeon questions related to meningitis. The surgeon advised plaintiff that she would need to know what type of meningitis Reda had if she started to feel sick, since that would determine her treatment.
 

 On the morning of December 28, plaintiff woke up feeling very sick. Plaintiff called Dr. Shimm to tell him how she was feeling and to ask the type of meningitis Reda had. Dr. Shimm stated that it was very contagious and that she should go to a hospital. Plaintiff also spoke to her personal physician, Dr. Hirschberg, who also advised her to go to the emergency room. Plaintiff was eventually diagnosed with the same type of meningitis as Reda and spent two weeks in the hospital. Plaintiff now suffers from significant hearing loss in her right ear and mild hearing loss in her left ear, as well as tinnitus.
 

 The foregoing are the facts given by plaintiff in her examination before trial, which at this stage, we must accept as true and accord every possible favorable inference. However, all three doctors — Beilin, Shimm and Tanowitz — testified that they did not recall speaking to plaintiff and they did not know of her. Dr. Shimm also testified that it was his understanding that Eschevaria was the only person that had been with Reda.
 
 *231
 
 Dr. Shimm provided Eschevaria, who had been a patient, with a prescription for antibiotics. At the hospital, Dr. Shimm spoke only to Eschevaria and the family. Immediately after Reda was admitted, Dr. Shimm contacted the infection control unit of Einstein. He also contacted the emergency room of Jacobi and the administrative officer of the day.
 

 Dr. Tanowitz testified that, at the time, he was the infectious disease consult at Einstein, and that someone from the infectious disease unit contacted him regarding Reda’s infectious meningitis. According to Dr. Tanowitz, the infection control nurse, Grace Hrynus, who has since passed away, spoke to her counterpart at Jacobi about identifying all the people who had been in contact with Reda. Nurse Hrynus identified about 20 or 25 people whom she spoke to over the phone. At the request of Nurse Hrynus, Dr. Tanowitz wrote a corresponding number of blank prescriptions and she filled in the names as people came to pick them up. Nurse Hrynus also reported Reda’s case to the New York City Department of Health. Nurse Hyrnus, however, did not contact plaintiff. Reda testified that approximately five days after she was hospitalized, Nurse Hrynus told her that she knew that plaintiff had been in contact with her.
 

 Plaintiff commenced this action, alleging that Montefiore, Einstein and the doctors were negligent in failing to provide her with treatment that would have immunized her from the meningitis. Plaintiff also alleged a violation of the applicable sections of New York City codes and regulations, the Public Health Law, and the State Sanitary Code pertaining to reporting, treating, warning and preventing the spread of communicable diseases.
 

 All of the defendants then moved for summary judgment. Supreme Court found that none of applicable sections of the New York City Health Code, the State Sanitary Code, and the Public Health Law provided for a private cause of action. Relying on
 
 Tenuto v Lederle Labs.
 
 (90 NY2d 606 [1997]), the court held that there was an issue of fact as to whether Drs. Shimm and Tanowitz breached a duty to warn based on plaintiff’s reliance on their advice that she did not need treatment. The court dismissed the complaint against Dr. Beilin, finding no duty since he did not provide any advice. The court held that since Drs. Shimm and Tanowitz were private physicians, Montefiore and Einstein could not be held vicariously liable for any alleged malpractice on their part. However, the court found that Einstein could be held vicariously liable for Nurse Hrynus’s failure to notify plaintiff that the meningitis was contagious.
 

 
 *232
 
 A divided Appellate Division modified the order of Supreme Court only to the extent of granting Einstein summary judgment because it could not be found liable for voluntarily agreeing to undertake an investigation, but failing to be thorough. As to Drs. Shimm and Tanowitz, the Court also relied on
 
 Tenuto
 
 in finding the existence of a duty. The two dissenting Justices argued that
 
 Tenuto
 
 requires a “special relationship” between the doctors and the nonpatient, and that no such relationship existed in this case between plaintiff and Drs. Shimm and Tanowitz. (295 AD2d 42, 63 [2002].) The dissent also argued that finding a duty in this case would expose doctors to liability to an “almost limitless category of possible plaintiffs.”
 
 (Id.
 
 at 61.) The Appellate Division granted the motion of Drs. Shimm and Tanowitz for leave to appeal to this Court, certifying the following question for this Court’s review: “Was the order of this Court, which modified the order of the Supreme Court, properly made?” We answer in the negative the issue before us — whether Drs. Tanowitz and Shimm owed a duty of care to plaintiff.
 
 [1]
 

 Analysis
 

 Ideally, assuming for present purposes that the allegations are true, Dr. Shimm and Dr. Tanowitz should have advised plaintiff that she needed treatment. Not all mistakes, however, result in liability. Rather, the threshold question in determining liability is whether the defendant owed plaintiff a duty of care. The question is a legal one for the courts to resolve, taking into account “common concepts of morality, logic and consideration of the social consequences of imposing the duty”
 
 CTenuto,
 
 90 NY2d at 612).
 

 Generally, a doctor only owes a duty of care to his or her patient. We have been reluctant to expand a doctor’s duty of care to a patient to encompass nonpatients. A critical concern underlying this reluctance is the danger that a recognition of a duty would render doctors liable to a prohibitive number of possible plaintiffs
 
 (see, Eiseman v State of New York,
 
 70 NY2d 175, 187 [1987];
 
 Purdy v Public Adm’r of County of Westches
 
 
 *233
 

 ter,
 
 72 NY2d 1, 8 [1988];
 
 Albala v City of New York,
 
 54 NY2d 269 [1981]).
 

 In
 
 Tenuto,
 
 we recognized that a doctor’s duty can, in limited circumstances, encompass nonpatients who have a special relationship with either the physician or the patient. Specifically, we held that a doctor owed a duty of care to the parents of an infant vaccinated for paralytic poliomyelitis, which could be breached by a failure to warn the parents of the risk of contracting polio while tending to the child’s basic needs. The Court recognized a special relationship based on the parents’ reliance on the doctor, both directly and indirectly, given their status as the infant patient’s primary caretakers, a duty heightened by the reality that a necessary part of the “comprehensive services” provided by pediatricians is the provision of advice to the parents who engage them (90 NY2d at 614).
 

 In the limited circumstances where we have expanded the duty, the third party’s injury resulted from the physician’s performance of the duty of care owed to the patient. Thus, in
 
 Tenuto,
 
 as we noted in
 
 Cohen v Cabrini Med. Ctr.
 
 (94 NY2d 639 [2000]), a critical factor was that “the physician’s acts in administering the [polio] vaccination to the infant * * * created the serious risk of physical harm to the parent” who contracted polio and sought to hold the physician liable
 
 (id.
 
 at 643). We have not, contrary to plaintiff’s contention, found a duty where the doctor’s performance of the medical service to the patient did not result in the harm complained of by the third person. In other words, since the duty that plaintiff seeks to extend is based on a doctor-patient relationship, the injury must have arisen from the doctor’s treatment of the patient. Nothing in
 
 Tenuto
 
 states otherwise. Plaintiff’s argument that
 
 Tenuto
 
 supports a finding of a duty in this case is based on misapprehension of language providing that an extension of the duty is warranted
 

 “when the service performed on behalf of the patient necessarily implicates protection of household members or other identified persons foresee-ably at risk because of a relationship with the patient, whom the doctor knows or should know may suffer harm by relying on prudent performance of that medical service” (90 NY2d at 613).
 
 [2]
 

 Under the rule stated, the harm complained of by the third
 
 *234
 
 person arises because of the doctor’s treatment of the patient. Since in this case there is no allegation that plaintiffs injury arose from the doctors’ treatment of Reda, an extension of the duty under these facts would be unprecedented.
 

 The circumstances of this case do not warrant finding the doctors accountable to plaintiff. In addition to the fact that plaintiffs illness did not arise as a result of the doctors’ treatment of Reda, up until the time that plaintiff allegedly approached the doctors, they had never met her. Unlike
 
 Tenuto
 
 where the parents had hired the doctor and relied exclusively on his medical advice, plaintiff approached several doctors whom she came into contact with, not including her personal doctor, regarding her concerns of having been in contact with someone diagnosed with meningitis.
 

 We are not unmindful of the fact that this case involves a communicable disease, and that it is a worthwhile public policy to encourage doctors to indicate to nonpatients who have been exposed to patients carrying such a disease that they should seek further medical advice. Notably, the Legislature has implemented a statutory scheme designed to protect people exposed to someone with a communicable disease. It is unfortunate that the scheme faltered and plaintiff was not contacted. As noted, plaintiff did not appeal from the ruling below that the statutes did not allow for a private cause of action.
 

 Accordingly, the order, insofar as appealed from, should be reversed, with costs, the motion of defendants Drs. Shimm and Tanowitz for summary judgment granted in its entirety, the complaint against said defendants dismissed and the certified question answered in the negative.
 

 Chief Judge Kaye (concurring). While joining the Court to dismiss plaintiffs complaint on summary judgment, I write separately to underscore the basis for my conclusion.
 

 The Court is once again at a familiar place: defining legal duty in a negligence case, in particular determining where to fix the limit of a doctor’s malpractice liability for professional advice allegedly given to someone not his patient. This sort of line-drawing — a policy-laden determination reflecting a balance of competing concerns — is invariably difficult not only because it looks in part to an unknowable future but also because it is in a sense arbitrary, hard to explain to the person
 
 *235
 
 just on the other side of the line, especially when grievous injury is alleged. Human compassion and rigorous logic resist the exercise. If this person can recover, why not the next? Yet line-drawing is necessary because, in determining responsibility for negligent acts, common-law courts also must look beyond the immediate facts and take into account the larger principles at stake, including the need “to limit the legal consequences of wrongs to a controllable degree”
 
 (Tobin v Grossman,
 
 24 NY2d 609, 619 [1969]).
 

 Only recently, this Court confronted the issue in
 
 Tenuto v Lederle Labs.
 
 (90 NY2d 606 [1997]) and
 
 Cohen v Cabrini Med. Ctr.
 
 (94 NY2d 639 [2000]), recognizing but clearly and narrowly circumscribing a physician’s duty to nonpatients. For reasons well articulated by Judge Smith, plaintiff falls outside the ambit of duty defined in those cases: there is no assertion of a direct or indirect patient/physician relationship, and no allegation that plaintiffs injury arose from the doctors’ treatment of their patient. To sustain a cause of action in plaintiffs circumstances therefore requires enlargement of the doctors’ ambit of duty, to patients’ friends, acquaintances and unknown other potential plaintiffs, a step I am unwilling to take based on the case before us.
 

 Finally, I agree that the alleged misconduct (vigorously disputed by the doctors) is deplorable. Plainly, doctors and others in similar circumstances should not be handing out professional advice casually. Legal principles, however, can only go so far in promoting desirable behavior. Moreover, in other circumstances, a claim for affirmatively giving bad professional advice may well fall within
 
 Tenuto.
 

 Chief Judge Kaye and Judges Ciparick, Wesley, Rosenblatt, Graffeo and Read concur with Judge Smith; Chief Judge Kaye concurs in a separate opinion.
 

 Order, insofar as appealed from, reversed, etc.
 

 [1]
 

 . Plaintiff alleged in her second cause of action and argued in the courts below that defendants had a duty pursuant to the Public Health Law, the Sanitary Code, and the New York City Health Code to provide her with treatment. Although on this appeal, plaintiff points to a statutory duty, she did not appeal the dismissal of the second cause of action and thus the determination that the applicable statutes do not provide for a private cause of action.
 

 [2]
 

 . Similarly, a physician completing a report of a physical examination of patient “owed a duty of care to his patient and
 
 to persons he knew or reason
 
 
 *234
 

 ably should have known were relying on him for this service to his patient”
 
 (Tenuto, 90 NY2d at 612, quoting
 
 Eiseman,
 
 70 NY2d at 188).