Stein, J.
(dissenting). The majority precipitously holds that medical professionals working in a hospital emergency room owe a duty of care to a non-patient member of the general public, requiring medical professionals who administer medication that may affect a patient’s driving ability to warn the patient — for the benefit of a third-party motorist — that he or she should not operate a motor vehicle upon discharge. Because I vehemently disagree that a duty running from a physician to a non-patient should be recognized under the circumstances presented here, I would reaffirm our long-standing precedent holding that a physician’s duty of care does not extend beyond the patient to the community at large, a result that is, I believe, mandated by any considered weighing of the societal interests involved. I, therefore, dissent.
L
I will begin with a recitation of the facts giving rise to this action as recounted in the complaint — which must be accepted *582 as true on this CPLR 3211 motion (see Leon v Martinez, 84 NY2d 83, 87-88 [1994]) — and as supplemented by plaintiffs’ documentary submissions to the trial court. One morning in March 2009, nonparty Lorraine Walsh visited the emergency room of defendant South Nassau Communities Hospital, complaining of severe internal pain. During intake, Walsh informed emergency room staff that she had arrived at the Hospital by car, but she did not specify whether she was the driver of the vehicle. Thereafter, Walsh was examined by defendants Dr. Regina E. Hammock and Christine DeLuca (a physician’s assistant), both of whom were employed by defendant Island Medical Physicians, P.C. Because Walsh informed the medical care providers that she was allergic to morphine, she was administered Dilaudid and Ativan, intravenously, a few minutes after 11:07 a.m. According to plaintiffs’ expert, Dr. Alan Schechter, Dilaudid is an opioid narcotic pain-killer and Ativan is a benzodiazepine drug used, among other things, as a muscle relaxant, as a sedative, and to treat anxiety. In Dr. Schechter’s opinion, any emergency room physician administering these narcotic medications should be aware that they can impair a patient’s ability to drive, and the standard of care in the medical community requires that physicians warn their patients accordingly.
Walsh was discharged, and she left the Hospital at 12:30 p.m., over one hour after the administration of Dilaudid and Ativan. Shortly thereafter, Walsh crossed a double yellow line while operating her vehicle, striking an oncoming bus driven by plaintiff Edwin Davis. In a subsequent action commenced by Walsh against defendants Hammock, DeLuca, and the Hospital, Walsh claimed that the medications she was administered rendered her “unconscious for a period of time” and caused or contributed to the accident.
Thereafter, Davis — and his wife, derivatively — commenced the instant action to recover damages for Davis’s personal injuries, asserting causes of action sounding in medical malpractice and negligent hiring and training of medical personnel against Hammock, DeLuca, and Island Medical Physicians, P.C. (collectively the Island Medical defendants), as well as the Hospital. Plaintiffs alleged that defendants committed medical malpractice by releasing Walsh from the Hospital “in severe pain, [in] a state of disorientation, under the influence of the [administered drugs]” and without providing proper instructions or “arranging her a safe method of travel home.”
*583 After joinder of issue, the Hospital and the Island Medical defendants moved to dismiss the complaint, asserting that plaintiffs had failed to state a cause of action for medical malpractice because the complaint did not plead the existence of a cognizable duty of care inasmuch as there was no allegation of a physician-patient relationship between Davis and defendants. Plaintiffs opposed the motions to dismiss and cross-moved for, among other things, leave to amend the complaint to add a cause of action sounding in simple negligence, arguing that defendants owed Davis a duty of care based on their administration of medication to Walsh and their allegedly negligent discharge of her from the Hospital.
Supreme Court, as relevant here, granted defendants’ motions to dismiss the complaint for failure to state a cause of action, and denied that branch of plaintiffs’ cross motion that sought leave to amend the complaint to add a negligence claim (2012 NY Slip Op 31969 [U] [Sup Ct, Nassau County 2012]). The court concluded that there was no basis for the proposed amendment because there was no duty running from defendants to non-patient Davis. The Appellate Division affirmed (119 AD3d 512, 513 [2d Dept 2014]), and we subsequently granted plaintiffs leave to appeal (24 NY3d 905 [2014]).
IL
As the majority recognizes, the threshold issue in any negligence or malpractice action is whether the defendant owed the plaintiff a legally recognized duty of care (see McNulty v City of New York, 100 NY2d 227, 232 [2003]; Hamilton v Beretta U.S.A. Corp., 96 NY2d 222, 232-233 [2001]). The question of whether and to whom a duty is owed “is a legal one for the courts to resolve, taking into account ‘common concepts of morality, logic and consideration of the social consequences of imposing the duty’ ” (McNulty, 100 NY2d at 232, quoting Tenuto v Lederle Labs., Div. of Am. Cyanamid Co., 90 NY2d 606, 612 [1997]). When conducting this analysis, “[d]espite often sympathetic facts in a particular case before them, courts must be mindful of the precedential, and consequential, future effects of their rulings, and ‘limit the legal consequences of wrongs to a controllable degree’ ” (Lauer v City of New York, 95 NY2d 95, 100 [2000], quoting Tobin v Grossman, 24 NY2d 609, 619 [1969]).
We have repeatedly emphasized that the “foreseeability of harm does not define duty” (532 Madison Ave. Gourmet Foods *584 v Finlandia Ctr., 96 NY2d 280, 289 [2001]; see Eiseman v State of New York, 70 NY2d 175, 187 [1987]; Pulka v Edelman, 40 NY2d 781, 785 [1976]); rather it “merely determines the scope of the duty once it is determined to exist” (Hamilton, 96 NY2d at 232). Consequently, “[a]bsent a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm” (532 Madison Ave. Gourmet Foods, 96 NY2d at 289). “This restriction is necessary to avoid exposing defendants to unlimited liability to an indeterminate class of persons conceivably injured by any negligence in a defendant’s act” (id.; see Hamilton, 96 NY2d at 232; Eiseman, 70 NY2d at 187). Thus, the foreseeability of Walsh experiencing side effects from the medications administered to her by defendants and causing an accident with her motor vehicle does not resolve the question of whether defendants may be held liable to plaintiffs in this case.
III.
Plaintiffs assert, and the majority concludes, that recognition of a duty under the circumstances here is merely an extension of our existing precedent concerning the scope of a physician’s duty. I disagree. To the contrary, our case law compels the conclusion that defendants owed Davis no duty of care to warn Walsh against, or prevent her from, driving because Davis was an unidentified and unknown stranger to defendants’ physician-patient relationship with Walsh.
In Eiseman v State of New York, a prison physician completed a health form required for an inmate to be admitted into a college program upon his release from incarceration (70 NY2d at 187). The physician failed to note that the inmate had a history of addiction and mental illness and, after acceptance and enrollment at the college, the inmate committed heinous crimes against several of his peers {see id. at 180-183). In the subsequent negligence action, we acknowledged that, although the relevant form did not require the physician to disclose the inmate’s history, in completing the form, the physician nevertheless “owed a duty of care to his patient and to persons he knew or reasonably should have known were relying on him for this service to his patient” — i.e., the college {id. at 188 [emphasis added]). Yet, in recognizing the possibility that a limited duty might be owed by a physician to a non-patient, we held that the physician did not “undertake a duty to the community at large,” and we were careful to limit the object of *585 such a potential duty to a specific identified individual or entity who the physician knew was relying on his or her services to the patient (id.).
The following year, in Purdy v Public Adm’r of County of Westchester, this Court was presented with the question of whether defendants, a health-related living facility and its admitting physician, owed a duty to a member of the public requiring them to prevent a resident — 73-year-old Emily Shaw, who had a medical condition that made her susceptible to fainting and blackouts — from, or warn her against, driving (72 NY2d 1, 6 [1988]). We recognized in Purdy that “there exist special circumstances in which there is sufficient authority and ability to control the conduct of third persons that we have identified a duty to do so,” such as where there is a “relationship between [the] defendant and a third person whose actions expose [the] plaintiff to harm such as would require the defendant to attempt to control the third person’s conduct; or a relationship between the defendant and plaintiff requiring [the] defendant to protect the plaintiff from the conduct of others” (id. at 8). However, we held that the defendants in Purdy had no duty to the plaintiff third party to prevent Shaw from driving because the facility and physician lacked “the necessary authority or ability to exercise . . . control over Shaw’s conduct so as to give rise to a duty on their part to protect [the] plaintiff — a member of the general public” (id. at 8-9). With respect to the plaintiff’s duty to warn theory, we acknowledged that other jurisdictions have held that a treating physician’s relationship to a patient could be sufficient to impose a duty running to members of the public to warn the patient of the adverse effects of medication on the ability to drive. However, we noted that, in New York, “[a] physician’s duty of care is ordinarily one owed to his or her patient” and not to the community at large (id. at 9-10). In any event, because the defendant physician was not Shaw’s treating physician and there was no evidence that any medication prescribed by the physician contributed to the accident, we held that no duty was established.[1]
By contrast, in Tenuto v Lederle Labs., Div. of Am. Cyanamid Co., we concluded that a special relationship existed *586 between the non-patient parents of an infant and the infant’s physician such that a duty was owed by the physician to the parents (90 NY2d at 611-612). There, the plaintiff parents presented their infant to her physician for the second dose of an oral poliomyelitis vaccine and, although it was known to the medical community that such vaccine presented a risk of transmittal to the parents, the physician did not warn the parents of that risk or explain how to avoid it (see id. at 610-611). The infant’s father contracted the poliomyelitis virus and commenced an action against the physician. We held that the parents’ complaint sufficiently alleged that the physician owed them a duty of care to warn of the risk, noting that
“[t]he relation of a physician to his patient and the immediate family is one of the highest trust. On account of his scientific knowledge and his peculiar relation, an attending physician is, in a certain sense, in custody of a patient afflicted with infectious or contagious disease. And he owes a duty to those who are ignorant of such disease, and who by reason of family ties, or otherwise, are liable to be brought in contact with the patient, to instruct and advise . . . them as to the character of the disease” (id. at 613 [some emphasis added] [internal quotation marks, some emphasis, and citations omitted]).
We also explained that a duty was cognizable under those circumstances because the physician’s treatment “necessarily implicate [d] protection of household members or other identified persons foreseeably at risk because of a relationship with the patient, whom the doctor [knew] or should [have] know[n] may [have] suffer [ed] harm by relying on prudent performance of that medical service” (id. [emphasis added]). In other words, we recognized a duty in Tenuto only because the plaintiffs there were “within a determinate and identified class — immediate family members — whose relationships to the person acted upon have traditionally been recognized as a means of extending and yet limiting the scope of liability for injuries caused by a party’s negligent acts or omissions” (id. at 614 [emphasis added]). Because there was a special relationship “triangulated” between the plaintiffs, the physician, and the patient in light *587 of the fact that “the physician [was] a pediatrician engaged by the parents to provide medical services to their infant, and whose services, by necessity, require[d] advising the patient’s parents,” our extension of a physician’s duty to a non-patient was careful and circumscribed (id. [emphasis added]).
To the extent, if any, that our decision in Tehuto could be read to permit the expansion of a physician’s duty to a member of the general public, we clarified the limits of our holding a few years later, in McNulty v City of New York (100 NY2d at 227). In McNulty, the Court refused to extend a physician’s duty to the friend of a patient being treated for contagious meningitis, even though the friend accompanied the patient to the hospital and directly inquired of two physicians whether she was at risk and should be treated in light of her close contact with the patient. In so holding, we clarified — again— that our holding in Tenuto was a very narrow one that relied on the special relationship between the parties and the physician’s awareness of the parents’ reliance on his services to the infant patient, combined with the fact that the physician’s treatment created the risk of harm (see id. at 233). We cautioned that, in the absence of such a convergence of factors, New York courts should be “reluctant to expand a doctor’s duty of care to a patient to encompass nonpatients,” in part due to the “critical concern . . . that a recognition of a duty would render doctors liable to a prohibitive number of possible plaintiffs” (id. at 232).
The rule of law that emerges from this line of cases is easily discerned. In New York, a physician’s duty to a patient, and the corresponding liability, may be extended beyond the patient only to someone who is both a readily identifiable third party of a definable class, usually a family member, and a person who the physician knew or should have known could be injured by the physician’s affirmative creation of a risk of harm through his or her treatment of the patient (see McNulty, 100 NY2d at 233-234; Cohen v Cabrini Med. Ctr., 94 NY2d 639, 642-644 [2000]; Eiseman, 70 NY2d at 188). I am not aware of anything — and the majority makes no attempt to identify anything — indicating that this clear rule has become so unworkable that the significant redefinition of the scope of a physician’s duty adopted by the majority is warranted. Under a reasoned application of our precedent to the facts of this case, it is evident that defendants owed no legal duty to Davis — or any other member of the public who may have come *588 into contact with, and been harmed by, Walsh after her discharge — to warn Walsh against, or prevent her from, driving (see McNulty, 100 NY2d at 233-234; Cohen, 94 NY2d at 642-644; Eiseman, 70 NY2d at 188; Rebollal v Payne, 145 AD2d 617, 617-618 [2d Dept 1988]).
The majority’s contrary conclusion and imposition of a duty to warn Walsh for the benefit of Davis and other motorists is inimical to the principles enunciated in Purdy, Eiseman, Tenuto, and McNulty because, while defendants arguably created a risk of harm by affirmatively giving Walsh medications that impaired her ability to drive, Davis is not a member of an identifiable and readily limited class.[2] Inexplicably, the majority acknowledges that we have consistently “declined to recognize a duty to an indeterminate, faceless, and ultimately prohibitively large class of plaintiffs” (majority op at 573), but then proceeds to recognize just such a duty in this case without articulating any clearly defined class to which this new duty runs. Under the Court’s decision in this case, the class of potential plaintiffs cannot be logically restricted or identified.
Ultimately, by imposing liability here, the majority eviscerates the precept that a physician generally owes a duty of care only to the patient, not to the community at large. The majority justifies its otherwise unsupportable position by pointing out that the harm to Davis here was foreseeable (which, as set forth above, is not dispositive) and by asserting that “our calculus is such that we assign the responsibility of care to the person or entity that can most effectively fulfill that obligation at the lowest cost” (majority op at 572). While it is true that we have stated in other contexts that a “ ‘key’ consideration criti *589 cal to the existence of a duty ... is ‘that the defendant’s relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm,’ ” we have also recognized in the next breath that, even where the defendant is best positioned to prevent harm, a duty should be imposed only where “ ‘the specter of limitless liability is not present because the class of potential plaintiffs to whom the duty is owed is circumscribed by the relationship’ ” (Matter of New York City Asbestos Litig., 5 NY3d 486, 494 [2005], quoting Hamilton, 96 NY2d at 233). “The law demands that the equation be balanced; that the damaged plaintiff be able to point the finger of responsibility at a defendant owing, not a general duty to society, but a specific duty to [the plaintiff]” (Johnson v Jamaica Hosp., 62 NY2d 523, 527 [1984]). The majority blatantly disregards this well-settled and crucial limitation on the recognition of a duty. Indeed, the duty it now adopts is not specific to Davis or based on any relationship he had with defendants or Walsh; rather, the duty imposed by the majority upon defendants here extends to any motorist, pedestrian, bicyclist, or other injured member of the public who comes into contact with any of defendants’ innumerable patients. However, our jurisprudence, both in general and in the specific context of physician-owed duties, has repeatedly rejected the imposition of a duty that will have such far-reaching and unmanageable consequences (see e.g. McNulty, 100 NY2d at 232; Hamilton, 96 NY2d at 234; Strauss v Belle Realty Co., 65 NY2d 399, 402 [1985] [it is the responsibility of the courts when fixing duty “to protect against crushing exposure to liability”]). The majority’s claim that it is not retreating from our heretofore cautious approach to recognizing new scopes of duties rings hollow in the face of its analysis and holding demonstrating otherwise.
IV.
Even if I were able to accept the premise that a logically defined duty could be extended to a non-patient third party under our prior decisions, this Court is obligated to balance certain relevant factors before making such a determination. These factors include “the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability” (Palka v Service- *590 master Mgt. Servs. Corp., 83 NY2d 579, 586 [1994]; see Hamilton, 96 NY2d at 232-233). A thorough and careful consideration of these factors — an analysis that is conspicuously absent from the majority’s decision — compels me to conclude that the societal costs of imposing upon physicians a duty to non-patient members of the general public greatly outweigh the potential benefits of permitting such individuals to recover against physicians for their injuries (see Matter of New York City Asbestos Litig., 5 NY3d at 493 [“any extension of the scope of duty must be tailored to reflect accurately the extent that its social benefits outweigh its costs”]; Hamilton, 96 NY2d at 232).
(A)
First, the extension of a duty under the circumstances presented here does not conform with the expectations of the parties or of society in general. Until now, it was unlikely that physicians would have expected to be held accountable to members of the community at large for decisions arising out of their treatment of an individual patient. This is because the duty of care owed to a patient arises out of the personal, private, and individualized relationship between the two parties. By contrast, physicians have no relationship with unidentified members of the public and cannot foresee or predict with whom their patients will come into contact. In addition, while patients certainly expect their medical providers to properly advise them of the risks and side effects associated with medications that are administered to them, patients have no reason to expect that their doctor’s advice to them could give rise to a cause of action against the physician in favor of a person with whom neither the physician nor the patient had prior contact. Thus, this factor of the duty analysis militates against the finding of a duty.
(B)
Second, it is indisputable that a medical professional who administers medication that is likely to impair a patient’s ability to drive owes a duty of care to the patient that may require the medical professional to warn the patient of potential risks and side effects of the medication, including advice regarding whether it is safe for the patient to operate a motor vehicle (see generally Nestorowich v Ricotta, 97 NY2d 393, 398 [2002]; Wolfgruber v Upjohn Co., 72 AD2d 59, 61 [4th Dept 1979], affd 52 NY2d 768 [1980]). It is precisely because the physician already *591 has a duty to undertake the action that plaintiffs claim will prevent future harm — i.e., to warn the patient — that the majority’s expansion of the scope of a physician’s liability to every member of the public will not create any additional social benefit at all. Nor will the imposition of a duty in favor of third parties render it more or less likely that the patient — with whom the ultimate decision to drive rests — will heed a medical provider’s warning not to operate a motor vehicle. That is, the extension of a duty under these circumstances will have little or no deterrent effect on the conduct which actually results in the harm — i.e., the operation of a motor vehicle by a person under the influence of medication — and there is little preventative benefit to be gained by the majority’s expansion of liability (see Matter of New York City Asbestos Litig., 5 NY3d at 495).
(C)
Third, while the majority’s departure from our precedent yields no appreciable benefit, the extension of a physician’s duty to warn a patient to a third party comes at a heavy cost, both financially and socially. As for the latter, in my view, it is readily foreseeable that the imposition of a duty and the corresponding expansion of liability to include non-patients will adversely interfere with the physician-patient relationship. It can hardly be disputed that, as this Court has previously stated, the relationship between a physician and patient “operates and flourishes in an atmosphere of transcendent trust and confidence and is infused with fiduciary obligations” (Aufrichtig v Lowell, 85 NY2d 540, 546 [1995]). As a fiduciary, a physician generally owes a duty of undivided loyalty to the patient, and the paramount consideration in a physician’s course of treatment must, therefore, be the patient’s health and well-being. Although a physician has a duty, generally, to warn patients of the potential for a medication to, among other things, interfere with driving ability, the physician’s decision in specific situations regarding which side effects to explain or warnings to give with particular medications is, undoubtedly, one that is made in the exercise of professional judgment, based on the physician’s weighing of the likelihood of danger or quantum of risk and a determination of the individual patient’s interests. Extending a physician’s duty beyond the patient to a boundless pool of potential plaintiffs creates a very real risk that a physician will be conflicted when deciding whether, and to what extent, medication should be administered and under what circumstances specific warnings should be issued. In my view,
*592 “[t]he consequences of this conflict for decisions regarding patient care are not insignificant. A physician whose attention is diverted from the patient to the effects of his advice on unknown persons who could be harmed by the patient’s future conduct ‘may, understandably, become less concerned about the particular requirements of any given patient, and more concerned with protecting himself or herself from lawsuits by the potentially vast number of person [s] who will interact with and may fall victim to that patient’s conduct outside of the treatment setting’ ” (Jarmie v Troncale, 306 Conn 578, 611-612, 50 A3d 802, 821 [2012], quoting Coombes v Florio, 450 Mass 182, 211, 877 NE2d 567, 587 [2007, Cordy, J., dissenting]).
For example, a physician may become overly cautious in prescribing necessary medications so as to avoid potential liability. Similarly, instead of giving only those warnings a physician truly believes to be warranted in a particular case, the physician may inundate a patient with excessive detail about potential, but unlikely, risks associated with a medication in order to insulate him- or herself from liability, thus distracting the patient from the most significant risks and side effects. Worse yet, these warnings may devolve into a general practice of physicians handing out pro forma lists of potential side effects that patients will cursorily sign prior to the administration of medications, ultimately resulting in fewer educated patients and less informed consent. While a physician may be ethically bound to refrain from allowing considerations of liability to influence his or her treatment decisions, it is naive, at best, to assume that the immeasurable liability that will result from the imposition of a duty owing to countless non-patients will have no impact upon a physician’s exercise of professional judgment.
The duty adopted by the majority also implicates concerns regarding physician-patient confidentiality (see CPLR 4504; Education Law § 6530) and, in my view, is unworkable on a practical level. For instance, where a patient who was administered medication without a warning against driving defaults in a legal action brought by an injured third party, or decides not to shift blame to the physician, the physician-patient privilege would bar disclosure to the injured party of the patient’s medi *593 cal records and communications with the physician (see Arons v Jutkowitz, 9 NY3d 393, 409 [2007]; Dillenbeck v Hess, 73 NY2d 278, 287-288 [1989]). An injured third party will, therefore, be unable to obtain the information necessary to establish or obtain a remedy for a breach of the physician’s purported duty to that party. Conversely, where an injured third party manages to state a claim despite a lack of cooperation from the patient, a physician’s inability to disclose privileged information concerning the patient may hamstring the physician’s ability to defend against the claim. Significantly, the majority does not address the rationality of imposing a duty upon a physician where a breach of that duty cannot be proved or disproved — absent a patient’s cooperation — without encouraging violations of the physician-patient privilege or requiring courts to delve into whether intrusion into the privilege and a patient’s privacy is warranted. In that regard, the likelihood of interference with the physician-patient relationship weighs heavily against extending a physician’s duty to a non-patient in this context.
(D)
Fourth, the expansion of a physician’s liability to include all members of the public injured by a patient’s operation of a motor vehicle while under the influence of medication will likely have a substantial financial impact on the medical profession and the availability of competent medical care throughout the state. Where, as here, “recognition of a duty would render doctors liable to a prohibitive number of possible plaintiffs” (Mc-Nulty, 100 NY2d at 232), such a duty will assuredly affect the cost and availability of medical care, as physicians will face an influx of litigation and rising malpractice insurance premiums. Injured non-patients will have every incentive to pursue litigation against physicians due to the availability of insurance coverage and, even if the majority of physicians successfully defeat such claims by demonstrating compliance with their already-existing duty to warn a patient where such a warning is warranted, the added cost of entering into litigation of these claims, either through summary judgment motions or trial, will take its toll.
Moreover, scenarios implicating a physician’s duty of care owed to members of the general public regarding his or her treatment of patients are endless, and the majority’s finding of a duty here presents a slippery slope, at the bottom of which a *594 physician’s ultimate liability could be staggering due to both the countless number of potential plaintiffs, as well as the myriad of ways in which liability may arise. Following the majority’s holding to its logical conclusion, a physician can arguably now be held liable, not just where a medication impairs driving ability due to its impact on a patient’s state of wakefulness, but also where a medication causes any other physical malady, for example, a severe stomach ache that distracts a driver or a rash of itchiness that causes a driver to release the steering wheel and lose control. The public as a whole gains little benefit from imposing upon physicians a scope of liability as vast as the one the majority now endorses. The societal cost, on the other hand, is significant.
(E)
Finally, plaintiffs lament that it is unfair to allow Walsh to recover against defendants for her own injuries if they failed to warn her not to drive, while concomitantly precluding Davis from obtaining the same recovery for his injuries. However, there is nothing inconsistent about allowing a patient, but not a stranger, to recover against a medical professional for a negligent failure to warn the patient. “Any conclusion regarding inconsistent outcomes must involve a comparison between two parties that stand in the same relationship to another party, and patients and injured third persons do not stand in the same relationship to health care providers” (Jarmie, 306 Conn at 600-601, 50 A3d at 815 [emphasis omitted]). Moreover, in almost all instances in which courts are asked to establish a duty, the courts must draw the line somewhere. As former Chief Judge Kaye eloquently stated,
“[t]his sort of line-drawing — a policy-laden determination reflecting a balance of competing concerns — is invariably difficult not only because it looks in part to an unknowable future but also because it is in a sense arbitrary, hard to explain to the person just on the other side of the line, especially when grievous injury is alleged. Human compassion and rigorous logic resist the exercise. If this person can recover, why not the next? Yet line-drawing is necessary because, in determining responsibility for negligent acts, common-law courts also must look beyond the immediate facts and take into account the larger principles at stake” *595 (McNulty, 100 NY2d at 234-235 [Kaye, Ch. J., concurring]).
Although I am sympathetic to plaintiffs and “it may seem that there should be a remedy for every wrong, this is an ideal limited perforce by the realities of this world” (Tobin v Grossman, 24 NY2d at 619; see Albala v City of New York, 54 NY2d 269, 274 [1981]). For, “[a] line must be drawn between the competing policy considerations of providing a remedy to everyone who is injured and of extending exposure to tort liability almost without limit” (De Angelis v Lutheran Med. Ctr., 58 NY2d 1053, 1055 [1983]). To extend the duty here is to subject physicians to potentially crushing liability attenuated from the common expectations of all involved.
In addition, in many cases, motorists who are injured as a result of a physician’s negligent failure to warn a patient of the possible side effects from the administration of medication are not entirely without recompense because they may be covered by their own motor vehicle or health insurance, or can pursue recovery against the patient/driver who directly caused the injury. While an injured party may occasionally be deprived of compensation by the absence of a duty in scenarios like the one here, I cannot agree with the majority that the possible benefits to be gained by creating a liability owing from physicians to every person who might potentially be injured by a patient— benefits which are not identified by the majority — outweigh the costs.
W
For all these reasons, I would decline to extend a physician’s duty to warn a patient about the effects of medication on his or her driving ability, beyond the duty already owed to the patient, to the community at large. My conclusion is consistent with, and compelled by, our precedent cautioning against the expansion of a physician’s scope of liability, which confines a physician’s duty to patients and specifically-identified persons who the doctor knows or has reason to know are relying upon the patient’s treatment and who are harmed by the physician’s affirmative creation of a risk. Adherence to this rule and our prior case law is necessary to avoid the imposition of a duty in cases like this, where the absence of a definable class of potential plaintiffs opens the door to limitless liability that will unduly interfere with the physician-patient relationship and increase the costs of medical care throughout the state, all *596 while producing minimal societal benefit. It is, therefore, my hope that the legislature — which has long expressed its concern regarding the impact of the costs of medical malpractice insurance and litigation on the affordability and availability of medical care — will carefully consider whether the majority’s holding is consistent with New York’s statutory medical malpractice schemes and the aims of tort recovery in New York.
Chief Judge Lippman and Judges Pigott and Rivera concur; Judge Stein dissents and votes to affirm in an opinion in which Judge Abdus-Salaam concurs.
Order modified, without costs, by denying the motions of the Island Medical Physicians, P.C. defendants and of defendant South Nassau Communities Hospital to dismiss the complaint and, as so modified, affirmed.

. Although we noted the existence of pertinent out-of-state case law cited by plaintiff in support of a duty in Purdy v Public Adm’r of County of Westchester, we did not implicitly or explicitly approve of it (72 NY2d 1, 9-10 [1988]). Indeed, because we found that case law to be inapplicable to the facts as presented there, we had no occasion to determine whether it was *586 consistent with governing principles of tort law in New York (see id.). Furthermore, as the majority concedes, out-of-state authority does not govern the disposition of this appeal or our determination of whether a duty exists under these circumstances (see majority op at 577-579 n 4).

. To the extent plaintiffs claim that defendants had a duty to actually prevent Walsh from leaving the Hospital — as opposed to merely issuing a warning against driving — defendants did not have “sufficient authority and ability to control” Walsh’s conduct to give rise to such a duty (Purdy, 72 NY2d at 8-9; see Kowalski v St. Francis Hosp. & Health Ctrs., 21 NY3d 480, 486 [2013]; D’Amico v Christie, 71 NY2d 76, 88 [1987]; Conboy v Mogeloff, 172 AD2d 912, 913 [3d Dept 1991], lv denied 78 NY2d 862 [1991]; Wagshall v Wagshall, 148 AD2d 445, 447 [2d Dept 1989], appeal dismissed and lv denied 74 NY2d 781 [1989]; Cartier v Long Is. Coll. Hosp., 111 AD2d 894, 895 [2d Dept 1985]). Moreover, there is clearly no relationship between defendants and Davis — who were completely unknown to one another prior to the accident — that required defendants to protect Davis from Walsh’s conduct or to consider the effects of their treatment of Walsh on him (compare Tenuto v Lederle Labs., Div. of Am. Cyanamid Co., 90 NY2d 606, 614 [1997]). The majority recognizes the absence of sufficient control here by limiting their holding to a duty to warn.