Kingsley v Price (2018 NY Slip Op 05088)





Kingsley v Price


2018 NY Slip Op 05088


Decided on July 6, 2018


Appellate Division, Fourth Department


DeJoseph, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on July 6, 2018
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: SMITH, J.P., DEJOSEPH, CURRAN, AND WINSLOW, JJ.


587CA 17-02014

[*1]SUSAN M. KINGSLEY, INDIVIDUALLY AND AS THE ADMINISTRATRIX OF THE ESTATE OF JAMES D. KINGSLEY, DECEASED, PLAINTIFF-RESPONDENT,
v
THOMAS EDWARD PRICE, M.D., WESTERN NEW YORK OCCUPATIONAL MEDICINE, P.C., MICHAEL ANTHONY TORRES, M.D., ALSO KNOWN AS MICHAEL A. TORRES, M.D., MBA, P.C., EASTERN NIAGARA RADIOLOGY AND NUCLEAR MEDICINE ASSOCIATES, P.C., AUREA SISMEA SUSHILA DESOUZA, M.D., LOCKPORT MEMORIAL HOSPITAL, EASTERN NIAGARA HOSPITAL, DEFENDANTS-APPELLANTS, AND NEW YORK STATE ELECTRIC AND GAS CORP., DEFENDANT-RESPONDENT.
NEW YORK STATE ELECTRIC AND GAS CORP., THIRD-PARTY PLAINTIFF,
v
ONSITE OCCUPATIONAL HEALTH SERVICES, INC., THIRD-PARTY DEFENDANT.
 ROACH, BROWN, MCCARTHY & GRUBER, P.C., BUFFALO (SETH HISER OF COUNSEL), FOR DEFENDANTS-APPELLANTS. DEMARIE & SCHOENBORN, P.C., BUFFALO (JOSEPH DEMARIE OF COUNSEL), FOR PLAINTIFF-RESPONDENT. NIXON PEABODY LLP, ROCHESTER (KEVIN T. SAUNDERS OF COUNSEL), FOR DEFENDANT-RESPONDENT. 


 Appeal from an order of the Supreme Court, Niagara County (Richard C. Kloch, Sr., A.J.), entered June 13, 2017. The order denied the motion of defendants-appellants for summary judgment dismissing the second amended complaint and cross claims against them.
 It is hereby ORDERED that the order so appealed from is reversed on the law without [*2]costs, the motion is granted, and the second amended complaint and cross claims against defendants-appellants are dismissed.



DeJoseph, J

BACKGROUND
Thomas Edward Price, M.D., Western New York Occupational Medicine, P.C. (WNYOM), Michael Anthony Torres, M.D., also known as Michael A. Torres, M.D., MBA, P.C., Eastern Niagara Radiology and Nuclear Medicine Associates, P.C., Aurea Sismea Sushila DeSouza, M.D., Lockport Memorial Hospital, and Eastern Niagara Hospital (defendants) appeal from an order that denied their motion for summary judgment dismissing the second amended complaint and any cross claims against them.
This case arises from the failure of defendants and defendant New York State Electric and Gas Corp. (NYSEG) to inform decedent James D. Kingsley that a chest x ray indicated that he might have lung cancer. Decedent was employed by NYSEG as a class 1 gas fitter. As part of an OSHA-mandated protocol associated with decedent's work activities, he was required to go through periodic medical examinations to determine whether he had an occupation-induced disease. On April 29, 2008, NYSEG sent decedent to WNYOM for an examination and "B-Read" chest
x ray, which is an x ray specifically geared to look for issues related to asbestos exposure. The chest x ray was performed at defendant Lockport Memorial Hospital and decedent signed a consent form prior to the procedure. The consent form provided, in pertinent part, the following:
"I, [decedent], understand that medical examinations done at this facility are for evaluation purposes for either employment suitability or worker's compensation injury/illness treatment. The examinations done here are not intended to detect all underlying health conditions and do not replace the medical care provided by my personal physician. I hereby consent to the examination for the stated purposes or request the services stipulated of [WNYOM].
Furthermore, I understand that all medical information related to my ability to perform the functions of my job will be reported to the designated employer representatives at my place of employment."
DeSouza, a radiologist, read the file and issued a report, noting: "R[ight] infrahilar, 4x3 centimeter density. Needs CT," meaning that there was an abnormal mass in decedent's lung and, to further define it, a CAT scan was recommended. The x ray report was sent to an associate analyst for Rochester Gas and Electric Company, a sister company of NYSEG, on May 5, 2008 and, after it was determined that the condition was not work related, NYSEG did not advise decedent of the findings. Decedent eventually reached out to NYSEG for information about the x ray and was made aware of the condition, but by that time the cancer was insurmountable and, on May 5, 2012, decedent died of metastatic lung cancer.
Prior to his death, decedent and his wife, plaintiff Susan M. Kingsley, commenced this action against defendants and NYSEG and asserted causes of action for medical malpractice [*3]and/or negligence, loss of consortium, and wrongful death [FN1] Decedent died during the pendency of this action. Kingsley maintained the action individually and as the administratrix of decedent's estate, and added a wrongful death cause of action on behalf of decedent's estate. based on allegations that defendants failed to inform decedent of the results of the chest
x ray. Defendants and NYSEG answered, and NYSEG asserted a cross claim against defendants for common-law contribution and indemnification. Plaintiff's bill of particulars to defendants alleged, inter alia, that defendants failed to notify decedent and/or his primary care physician about the x ray results.
Defendants moved for summary judgment dismissing the second amended complaint and any cross claims against them or, in the alternative, to dismiss any cause of action for medical malpractice against them. Supreme Court denied the motion and defendants appeal.
DISCUSSION
At the outset, we conclude that, as set forth in the pleadings and amplified by the bill of particulars, plaintiff's first cause of action sounds in ordinary negligence, not medical malpractice. The first cause of action is predicated solely on defendants' failure to transmit information about the mass discovered on decedent's chest
x ray to decedent or his primary care physician. "The failure to communicate significant medical findings to a patient or his treating physician is not malpractice but ordinary negligence" (Yaniv v Taub, 256 AD2d 273, 274 [1st Dept 1998]; see Mancuso v Kaleida Health, 100 AD3d 1468, 1468-1469 [4th Dept 2012]). Moreover, "liability for medical malpractice may not be imposed absent a physician-patient relationship, either express or implied, because there is no legal duty in the absence of such a relationship' " (Cygan v Kaleida Health, 51 AD3d 1373, 1375 [4th Dept 2008]; see Gedon v Bry-Lin Hosps., 286 AD2d 892, 893-894 [4th Dept 2001], lv denied 98 NY2d 601 [2002]). Here, Price and Torres were not involved in any physical examination of decedent or in taking or reviewing his x ray, and there are no allegations that DeSouza incorrectly read decedent's x ray or that decedent was injured when the x ray was taken. Thus, the first cause of action is not for medical malpractice, but for ordinary negligence.
In view of the foregoing, the issue before us is whether defendants had a legal duty, in the context of ordinary negligence, to inform decedent or his physician of the mass in his lung that was detected with the x ray. "Because a finding of negligence must be based on the breach of a duty, a threshold question in tort cases is whether the alleged tortfeasor owed a duty of care to the injured party" (Espinal v Melville Snow Contrs., Inc., 98 NY2d 136, 138 [2002]). "In the absence of a duty, as a matter of law, there can be no liability" (Pasternack v Laboratory Corp. of Am. Holdings, 27 NY3d 817, 825 [2016], rearg denied 28 NY3d 956 [2016]; see Gonzalez v Povoski, 149 AD3d 1472, 1473 [4th Dept 2017]), and "the existence and scope of a duty is a question of law requiring courts to balance sometimes competing public policy considerations" (Espinal, 98 NY2d at 138). "To discern whether a duty exists, the court must not engage in a simple weighing of equities, for a legal duty does not arise when[ever] symmetry and sympathy would so seem to be best served' " (Matter of New York City Asbestos Litig., 27 NY3d 765, 787-788 [2016], quoting De Angelis v Lutheran Med. Ctr., 58 NY2d 1053, 1055 [1983]). Along with "logic and science, . . . policy [considerations] play an important role" in determining the bounds of duty (De Angelis, 58 NY2d at 1055). "[I]n determining whether a duty exists, courts must be mindful of the precedential, and consequential, future effects of their rulings, and limit the legal consequences of wrongs to a controllable degree" (Hamilton v Beretta U.S.A. Corp., 96 NY2d [*4]222, 232 [2001] [internal quotation marks omitted]).
The Court of Appeals has balanced a number of factors in analyzing questions of duty, "including the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability" (Palka v Servicemaster Mgt. Servs. Corp., 83 NY2d 579, 586 [1994]; see New York City Asbestos Litig., 27 NY3d at 788; Gilson v Metropolitan Opera, 5 NY3d 574, 576-577 [2005]). Moreover, "[f]oreseeability, alone, does not define duty—it merely determines the scope of the duty once it is determined to exist" (Hamilton, 96 NY2d at 232).
NYSEG and plaintiff rely on Davis v South Nassau Communities Hosp. (26 NY3d 563 [2015]) and Landon v Kroll Lab. Specialists, Inc. (22 NY3d 1 [2013], rearg denied 22 NY3d 1084 [2014]) — as did the court — in asserting that defendants had a duty to convey the x ray results to decedent and/or his personal physician, while defendants contend that those cases are inapposite. We agree with defendants that neither Davis nor Landon requires finding a duty under these circumstances.
In Davis, a patient was intravenously treated by the defendants with an opioid narcotic pain killer and a benzodiazepine drug, and was discharged from the defendant hospital about an hour and a half after the medications were administered (Davis, 26 NY3d at 570). Nineteen minutes after her discharge, the patient was involved in a motor vehicle accident wherein she crossed a double yellow line and struck a bus operated by the plaintiff driver (id. at 570-571). The Court of Appeals held that, "[u]nder these facts," the defendants owed to the plaintiffs a "duty to warn" the discharged patient that the medication she was given "either impaired or could have impaired her ability to safely operate an automobile" (id. at 571).
In Landon, the Court of Appeals held that the defendant drug testing laboratory could be liable under the common law for negligence in the testing of the plaintiff's "biological sample" (Landon, 22 NY3d at 3). At the time of the test, the plaintiff was serving a five-year term of probation and was subject to random drug testing (id. at 4). The defendant performed tests on plaintiff's oral fluid sample pursuant to a contract with Orange County and its probation department, and the plaintiff's sample "screen tested positive for THC" (id.). The plaintiff obtained an independent blood test the same day that the oral fluid sample was taken, which came back negative for illicit and controlled substances (id.). In his complaint, the plaintiff alleged that the defendant's report describing the results of the positive test was the result of "systemic negligence" because the test was performed without any type of confirmation test or a simultaneous urine sample, and the screen test cutoff level employed by the defendant was substantially lower than other standards (id. at 4-5). He alleged that he was required to serve an extended term of probation because of the false test results and defend himself in a violation of probation proceeding brought against him by the probation department (id. at 5).
In Landon, the Court held that, "[u]nder the circumstances," the defendant owed a duty of care to the plaintiff to adhere to professionally accepted scientific testing standards in performing his drug test (id. at 6-7). There were "strong policy-based considerations" behind finding such a duty, including that a false positive report would have "profound, potentially life-altering, consequences for a test subject," and that the defendant was in "the best position to prevent false positive results" (id. at 6). Even though there was no contractual relationship between the defendant and the plaintiff, the Court determined that a duty arose
" where the contracting party, in failing to exercise reasonable care in the performance of [its] duties, launche[s] a force or instrument of harm' " (id., quoting Espinal, 98 NY2d at 140).
In this case, however, it is clear that defendants did not launch a force or instrument of harm. Here, there is no dispute that defendants correctly interpreted the results of the x ray and timely conveyed the results to decedent's employer. Notably absent from the record is the identity or even existence of decedent's treating physician. Nor is there any indication that defendants were made aware of any treating physician. Furthermore, the consent form, executed by decedent, specifically indicated that decedent "underst[oo]d that all medical information related to [his] ability to perform the functions of [his] job w[ould] be reported to the designated employer representatives at [his] place of employment." There is also no dispute that defendants adhered to the requirements set forth in the consent form. We therefore conclude that under Landon and Davis there was no duty to decedent and, as stated by the Court of Appeals, "[w]e have been reluctant to expand a doctor's duty of care to a patient to encompass nonpatients. A critical concern underlying this reluctance is the danger that a recognition of a duty would render doctors liable to a prohibitive number of possible plaintiffs" (McNulty v City of New York, 100 NY2d 227, 232 [2003]).
Our dissenting colleague relies heavily on Davis and concludes that, "[b]ut for the expansive duty articulated by the Court of Appeals in Davis with respect to medical professionals, I would have joined the majority." In our view, however, the generalized statements about legal duties in Davis were intended to summarize existing law, not to call into question longstanding precedents. Indeed, the Court made it a point to note that its holding was limited to the particular facts before it (see Davis, 26 NY3d at 571), and explicitly stated that "our decision herein should not be construed as an erosion of the prevailing principle that courts should proceed cautiously and carefully in recognizing a duty of care" (id. at 580). Notably, the Davis Court reiterated a principle that guides our view of the facts and circumstances of this case: " [w]hile the temptation is always great to provide a form of relief to one who has suffered, . . . the law cannot provide a remedy for every injury incurred' " (id.).
Plaintiff's and our dissenting colleague's reliance on Price's testimony regarding an "ethical" duty and a WNYOM written protocol is misplaced inasmuch as Price's testimony and the written protocol do not conclusively establish a legal duty running from defendants to decedent. "[T]he duty owed by one member of society to another is a legal issue for the courts" (Eiseman v State, 70 NY2d 175, 187 [1987]). "While moral and logical judgments are significant components of the analysis, we are also bound to consider the larger social consequences of our decisions and to tailor our notion of duty so that the legal consequences of wrongs [are limited] to a controllable degree" (id. [internal quotation marks omitted]). "A line must be drawn between the competing policy considerations of providing a remedy to everyone who is injured and of extending exposure to tort liability almost without limit. It is always tempting, especially when symmetry and sympathy would so seem to be best served, to impose new duties, and, concomitantly, liabilities, regardless of the economic and social burden. But, absent legislative intervention, the fixing of the orbit' of duty, as here, in the end is the responsibility of the courts" (De Angelis, 58 NY2d at 1055). Here, we conclude that neither Price's testimony or the WNYOM written protocol imposed a legal requirement on defendants to disclose the
x ray results to decedent and/or his treating physician.
We further agree with defendants that NYSEG's contention that defendants had a regulatory duty to provide the results to decedent (see 29 CFR 1910.1001 [I] [7] [i] [C]) is raised for the first time in its postargument submission to this Court and is therefore not properly before us (see Matter of Fichera v New York State Dept. of Envtl. Conservation, 159 AD3d 1493, 1495-1496 [4th Dept 2018]; see generally Ciesinski v Town of Aurora, 202 AD2d 984, 985 [4th Dept 1994]).
In view of the foregoing, the court erred in denying defendants' motion inasmuch as defendants had no legal duty to decedent to provide him or his treating physician with a copy of the x ray results. Accordingly, we conclude that the order should be reversed, the motion should be granted, and the second amended complaint and cross claims against defendants should be dismissed.
All concur except Curran, J., who dissents and votes to affirm in the following opinion: I respectfully dissent, and I conclude that, in this case, defendants-appellants (defendants) owed a duty of care to decedent James D. Kingsley pursuant to Davis v South Nassau Communities Hosp. (26 NY3d 563 [2015]). But for the expansive duty articulated by the Court of Appeals in Davis with respect to medical professionals, I would have joined the majority.
In determining whether a duty exits, "courts identify what people may reasonably expect of one another" (Darby v Compagnie Natl. Air France, 96 NY2d 343, 347 [2001]). "The question of duty . . . is best expressed as whether the plaintiff's interests are entitled to legal protection against the defendant's conduct" (Pulka v Edelman, 40 NY2d 781, 782 [1976], rearg denied 41 NY2d 901 [1977] [internal quotation marks omitted]). "Courts resolve legal duty questions by resort to common concepts of morality, logic and consideration of the social consequences of imposing a duty" (Tenuto v Lederle Labs., Div. of Am. Cyanamid Co., 90 NY2d 606, 612 [1997]). It is "critical" to consider "whether the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm" (Davis, 26 NY3d at 572 [internal quotation marks omitted]). Simply put, "we assign the responsibility of care to the person or entity that can most effectively fulfill that obligation at the lowest cost" (id.).
In Davis, the defendant physicians and hospital administered medications to a patient who allegedly became unconscious while driving home from the hospital, causing her vehicle to cross a double yellow line and strike a bus that was traveling in the opposite direction (id. at 570-571). The Court held that the defendants owed the plaintiff bus driver a duty to warn the patient that the medication they had administered to the patient impaired her ability to safely operate a motor vehicle (id. at 571). In so holding, the Court recognized that the defendants owed a duty to "every motorist in [the nonparty patient's] vicinity" (id. at 577). As criticized by the dissent in Davis, that is akin to a duty owed by the defendants to "an unidentified unknown stranger to defendants' physician-patient relationship" (id. at 584 [Stein, J., dissenting]). Although the majority here accurately observes that the Court in Davis limited its decision to the facts before it (id. at 571), a duty, once recognized, cannot be limited to a single set of facts. Rather, the "key" to understanding the existence of a duty encompassing various factual scenarios is the relationship between the defendant and the injured party (Hamilton v Beretta U.S.A. Corp., 96 NY2d 222, 233 [2001]).
In my view, the relationship here between defendants and decedent is even more direct than the relationship between the defendants and the plaintiff in Davis and thus, the negligence cause of action in this case fits very comfortably within the duty of care recognized in Davis. Indeed, the Davis Court found that medical professionals had a duty to a non-patient, who was a complete stranger to the physician-patient relationship. The concepts of morality and logic must therefore support imposing a duty under the instant circumstances, i.e., that a physician who examines a person and becomes aware of a potentially deadly condition in that person has a duty to make at least minimal efforts to notify that fellow human being of such condition. The social consequences of applying such a duty of care here are minimal, and clearly less demanding than in Davis, which the dissent described as the "heavy cost" of "[e]xtending a physician's duty beyond the patient to a boundless pool of potential plaintiffs" (id. at 591 [Stein, J., dissenting]).
Here, decedent was a member of a specific class of employees who were examined by defendants, he was readily identifiable by these defendants, and he was in fact known to them by name. Defendants also were in a uniquely favorable position, as physicians, to appreciate what defendant Thomas Edward Price, M.D. characterized as a "very significant" finding that was possible evidence of a cancerous tumor, and to notify decedent of the risk of harm. Price also candidly admitted that, "ethically," defendant Western New York Occupational Medicine, P.C. (WNYOM) should have followed up with decedent, and that it was in fact WNYOM's practice to contact examinees about any abnormalities. It would have taken very little effort on the part of defendants, especially in this modern era of electronic communication, to alert decedent to the "very significant" finding from the examination. Moreover, applying the Davis duty of care here does not impose much of an additional burden on defendants, if any at all, because it was their "practice" to contact the examinees regarding such findings. I further submit that imposing the Davis duty of care here does not precipitate any more of an expansion of liability for medical professionals than in Davis (and probably much less) because, based on this record, it can be reasonably presumed that medical professionals in defendants' position would have believed that they had an ethical duty to apprise an examinee of such a "very significant" finding.
Accordingly, I would affirm the order denying defendants' motion for summary judgment dismissing the second amended complaint and any
cross claims against them.
Entered: July 6, 2018
Mark W. Bennett
Clerk of the Court



Footnotes