This opinion is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------

No. 163
Edwin Davis et al.,
          Appellants,
        v.
South Nassau Communities
Hospital, et al.,
          Respondents.

          Joseph G. Dell, for appellants.
          James W. Tuffin, for respondents Hammock et al.
          Robert G. Vizza, for respondent South Nassau
Communities Hospital.
          The Medical Society of the State of New York et al.;
Healthcare Association of New York State, Inc., amici curiae.

FAHEY, J.:

          This action arises from a motor vehicle accident that

occurred after nonparty Lorraine A. Walsh was treated at

defendant South Nassau Communities Hospital (Hospital) by

defendants Regina E. Hammock, D.O. and Christine DeLuca, RPA-C,

- 1 -

that is, medical professionals employed by defendant Island Medical Physicians, P.C. (collectively, Island Medical defendants). As a part of that treatment, defendants intravenously administered to Walsh an opioid narcotic painkiller and a benzodiazepine drug without warning her that such medication either impaired or could impair her ability to safely operate an automobile. Shortly thereafter, Walsh drove herself from the Hospital and, while allegedly impaired by the medication administered to her at that facility, she was involved in an accident. The automobile she operated crossed a double yellow line and struck a bus driven by Edwin Davis (plaintiff).

Here we are confronted with the question whether third party liability can attach when a hospital administered drugs to a patient and then released her, in an impaired state, without any warning that the drugs affected or could have affected her ability to safely operate a motor vehicle. Stated differently, the main question is whether defendants owed a duty to plaintiff and his wife, Dianna,[1] to warn Walsh that the medication defendants gave to Walsh either impaired or could have impaired her ability to safely operate a motor vehicle following her departure from the Hospital.

We are mindful that in addressing the modification of a legal duty, its reach must be limited by what is foreseeable.

---

[1] Dianna Davis was not involved in the accident, but she has asserted a derivative cause of action for loss of consortium.

Any expansion of duty is a power to be exercised cautiously, but it is a power that must be used if the changing needs of society are to be met.  It was succinctly stated by Judge Cardozo that "[t]he principle that the danger must be imminent does not change, but the things subject to the principle do change.  They are whatever the needs of life in a developing civilization require them to be" (MacPherson v Buick Motor Co., 217 NY 382, 391 [1916]).  For the reasons that follow, we conclude that where a medical provider has administered to a patient medication that impairs or could impair the patient's ability to safely operate an automobile, the medical provider has a duty to third parties to warn the patient of that danger.

## I.

On March 4, 2009, Walsh sought treatment at the Hospital's emergency room.  According to plaintiffs, Walsh's medical records indicate that she drove herself to the Hospital, where she was intravenously administered Dilaudid, an opioid narcotic painkiller, and Ativan, a benzodiazepine drug, at 11:00 a.m.

The record reflects that "[c]ommon side effects [of Ativan] include sedation, dizziness, weakness, unsteadiness, and disorientation."  Plaintiffs' expert averred that such drug has a "sedative/hypnotic" effect.  Plaintiffs' expert also explained that "Dilaudid has two to eight times the painkilling effect of morphine," that the half-life of intravenously-administered

Dilaudid is two to four hours, and that the Dilaudid package label and package insert contain various cautionary instructions pertinent to this matter.  For example, plaintiffs' expert noted that "the package label for Dialudid states that it 'may impair mental and/or physical ability needed to perform potentially hazardous activities such as driving a car or operating machinery.' "  The same expert further noted that the section of the package insert for Dilaudid "titled *Use in Ambulatory Patients*[] states that the drug 'may impair mental and/or physical ability required for the performance of potentially hazardous tasks (e.g., driving, operating machinery).  Patients should be cautioned accordingly.' "  In the words of that expert, the "insert also states that the most common adverse effects of [Dilaudid] are 'more prominent in[, inter alia,] ambulatory patients.' "

Walsh was discharged from the Hospital at 12:30 p.m. on the date in question.  She drove herself away from that facility. Nineteen minutes after that discharge, Walsh was involved in a motor vehicle accident in which the vehicle she was driving crossed a double yellow line and struck an automobile operated by plaintiff. According to plaintiffs, the accident occurred while Walsh was in "a state of disorientation" and "under the influence of the aforementioned drugs."

Plaintiffs subsequently commenced this action against the Island Medical defendants and the Hospital.  The complaint

alleges, in relevant part, that Walsh sought the professional care of defendants on the date in question; that defendants rendered medical care to Walsh at that time; that, in the course of rendering such care to Walsh, defendants administered to Walsh the medication at issue; that defendants did not warn Walsh of the effects of such medication; and that the accident occurred while Walsh was affected by such medication. Based on those allegations, plaintiffs seek damages for injuries they sustained as the result of defendants' alleged medical malpractice in treating Walsh.

After issue was joined, the Island Medical defendants moved to dismiss the complaint for failure to state a cause of action (see CPLR 3211 [a] [7]), essentially contending that they did not owe plaintiffs a duty of care inasmuch as plaintiffs were third parties to the treatment rendered to Walsh. The Hospital cross-moved for the same relief, while plaintiffs cross-moved for an order both granting leave to serve an amended complaint asserting a cause of action for negligence and consolidating this action with two other actions arising from the subject accident. Supreme Court granted the motion of the Island Medical defendants and the cross motion of the Hospital seeking dismissal of the complaint while concomitantly denying plaintiffs' cross motion. On appeal, the Appellate Division affirmed, reasoning that because "only Walsh . . . had a physician-patient relationship with the defendants[,] . . . the allegations did not support a

duty of care owed by the defendants to the injured plaintiff"
(119 AD3d 512, 514 [2d Dept 2014]).  We granted plaintiffs leave
to appeal (24 NY3d 905 [2014]).

II.

Under these facts, defendants owed to plaintiffs a duty
to warn Walsh that the medication administered to her either
impaired or could have impaired her ability to safely operate an
automobile.  We begin our discussion of that issue with reference
to the principles of law that inform our review.

In the context of a motion to dismiss pursuant to CPLR
3211, we "determine only whether the facts as alleged fit within
any cognizable legal theory" (Leon v Martinez, 84 NY2d 83, 87-88
[1994]).  "[T]he criterion is whether the proponent of the
pleading has a cause of action, not whether he [or she] has
stated one" (id. at 88 [internal quotation marks omitted]).  We
"may freely consider affidavits submitted by the plaintiff to
remedy any defects in the complaint" (id.).

Similarly germane is our jurisprudence with respect to
the recognition of a duty of care.  "The threshold question in
any negligence action is[] [whether the] defendant owe[s] a
legally recognized duty of care to [the] plaintiff" (Hamilton v
Beretta U.S.A. Corp., 96 NY2d 222, 232 [2001]).  "The question of
whether a member or group of society owes a duty of care to
reasonably avoid injury to another is [one] of law for the
courts" (Purdy v Public Adm'r of County of Westchester, 72 NY2d

1, 8 [1988], <u>rearg denied</u> 72 NY2d 953 [1988]).  "Courts resolve legal duty questions by resort to common concepts of morality, logic and consideration of the social consequences of imposing the duty" (<u>Tenuto v Lederle Labs., Div. of Am. Cyanamid Co.</u>, 90 NY2d 606, 612 [1997]; <u>see</u> <u>Palka v Servicemaster Mgt. Servs. Corp.</u>, 83 NY2d 579, 586 [1994]).  A critical consideration in determining whether a duty exists is whether "the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm" (<u>Hamilton</u>, 96 NY2d at 233).

Said another way, our calculus is such that we assign the responsibility of care to the person or entity that can most effectively fulfill that obligation at the lowest cost.  It is against that backdrop that we conclude that, under the facts alleged, defendants owed plaintiffs a duty to warn Walsh that the medication defendants administered to Walsh impaired her ability to safely operate a motor vehicle.

A.

In evaluating duty questions we have historically proceeded carefully and with reluctance to expand an existing duty of care.  In a series of cases including <u>Eiseman v State of New York</u> (70 NY2d 175 [1987]), <u>Purdy</u> (72 NY2d 1), <u>Tenuto</u> (90 NY2d 606), and <u>McNulty v City of New York</u> (100 NY2d 227 [2003]), we declined to impose a broad duty of care extending from physicians past their patients "to members of the . . . community

individually" (Eiseman, 70 NY2d at 188). That is, we declined to recognize a duty to an indeterminate, faceless, and ultimately prohibitively large class of plaintiffs, as opposed to "a known and identifiable group" (Palka, 83 NY2d at 589; see McNulty, 100 NY2d at 232; Eiseman, 70 NY2d at 187).

Specifically, in Eiseman we considered circumstances in which "an ex-felon with a history of drug abuse and criminal conduct" was released from incarceration and "accepted into a special State college program for the disadvantaged" (id. at 180). Following his acceptance into that program, the ex-felon raped and murdered a fellow student (see id.). The administrator of the decedent's estate sought recovery from the State on the ground that a prison physician negligently ignored the ex-felon's emotional instability and history of mental disorder in completing an examination report. The report was submitted in conjunction with that convict's admission into the college program (see id. at 182-183). Although we concluded that "the physician plainly owed a duty of care to his patient and to persons he knew or reasonably should have known were relying on him for this service to his patient," we maintained that "[t]he physician did not . . . undertake a duty to the community at large," and more specifically that the physician did not owe a duty of care to "members of the . . . community individually" (id. at 188). Consequently, we determined that the State, as the employer of the physician, had no duty to inform the victim of

the convict's medical history (see id. at 188-189).

About a year after deciding Eiseman, we determined Purdy (72 NY2d 1). In that case the plaintiff was struck and injured by a speeding car while he patronized a gas station. The offending vehicle was operated by a resident of the defendant-nursing home, who had "a medical condition that left her susceptible to fainting spells and blackouts" (id. at 6). We considered the question whether the nursing home and the defendant-physician, who was merely the admitting physician at the nursing home, "owed to [the] plaintiff--an unidentified member of the public--a duty either to prevent [the resident] from driving or to warn her of the dangers of driving given her medical condition" (id.). In doing so, we acknowledged that "there exist special circumstances in which there is sufficient authority and ability to control the conduct of third persons that [have given rise to] a duty to do so" (id. at 8). More particularly, we indicated that those circumstances exist where there is a special relationship, which we described as, inter alia, "a relationship between [the] defendant and a third person whose actions expose [the] plaintiff to harm such as would require the defendant to attempt to control the third person's conduct" (id.).

Nevertheless, on those facts we determined that there was no "special relationship between [the] defendants and [the resident] such as would require [the defendants] to control [the

resident's] conduct for the benefit of [the] plaintiff" (id.).
We specifically "conclude[d] . . . that neither [the nursing
home] nor [the physician] had the necessary authority or ability
to exercise such control over [the resident's] conduct so as to
give rise to a duty on their part to protect [the] plaintiff--a
member of the general public" (id. at 8-9).

After Purdy we heard Tenuto (90 NY2d 606), wherein we
concluded that, under the circumstances of that case, a physician
had a duty of reasonable care to the parents of a five-month-old
to whom he administered an oral polio vaccine.  The physician
allegedly did not advise the parents of their risk of exposure to
the polio virus following the administration of that vaccine, and
the plaintiff-father was subsequently afflicted with that
disease.  Relying on both foreign authorities and Eiseman (70
NY2d at 188), we indicated that members of a patient's immediate
family or household who may suffer harm as a result of the
medical care a physician renders to that patient benefit from a
duty of care running to them from the physician (see Tenuto, 90
NY2d at 610-614).  In so concluding, we noted that there the
"existence of a special relationship sufficient to supply the
predicate for extending the duty to warn and advise [the]
plaintiffs of their peril [was] especially pointed [inasmuch as]
the physician [was] a pediatrician engaged by the parents to
provide medical services to their infant, and whose services, by
necessity, require[d] advising the patient's parents" (id. at

614).

Tenuto was arguably constrained by our decision in McNulty (100 NY2d 227).[2]  There we were called upon to decide whether the defendant-physicians owed a duty of care to the plaintiff, who was a friend of a woman they had treated for infectious meningitis and who subsequently contracted that disease herself.  In that case the physicians allegedly answered in the negative the plaintiff's question whether she needed treatment after being in close contact with her infected friend (id. at 229).  Significantly, we stated there was "no allegation that [the] plaintiff's injury arose from the [physicians'] treatment of [the patient]."  We concluded that an extension of the duty physicians owe their patients so as to cover the plaintiff would have been unprecedented (McNulty, 100 NY2d at 234).[3]

_____

[2]     After deciding Tenuto but before hearing McNulty we determined Cohen v Cabrini Med. Ctr. (94 NY2d 639 [2000]), wherein we refused to recognize a duty of care running from the physician of the plaintiff's husband to the plaintiff to prevent the personal injuries complained of there, namely, the unwitting diminishment of the ability of the plaintiff's husband to impregnate the plaintiff.  We reasoned that a contrary holding "would be an unwarranted extension of our narrowly drawn jurisprudence with respect to malpractice liability to a patient's family member" (id. at 643).

[3]     Here we have specifically discussed the existence and scope of duty in the context of the administration of medical services.  We note, however, that our caution in setting the parameters of duty in that context is also evident in other circumstances.
     For example, in D'Amico v Christie (71 NY2d 76 [1987]) we

B.

We left open the possibility of the recognition of a duty in a case such as this through McNulty and Purdy.  In McNulty, we observed that, "[i]n the limited circumstances where we have expanded the duty [of care of a treating physician so as to include a third party], the third party's injury resulted from the physician's performance of the duty of care owed to the patient" (McNulty, 100 NY2d at 233).  More importantly, in Purdy, in addition to determining that neither the defendant-nursing home nor the defendant-physician owed a duty to the public to

---

reiterated the rule that landowners "have a duty to control the conduct of third persons on their premises when they have the opportunity to control such persons and are reasonably aware of the need for such control" (id. at 85).  Through that opinion we decided two appeals--D'Amico and Henry v Vann--and the second of those appeals arose from circumstances in which an employer detected an intoxicated employee, fired the employee, and told the employee to leave the employer's premises, whereupon the dismissed employee drove approximately one-half mile away before colliding with an oncoming vehicle (Henry, 71 NY2d at 82).  On those facts we concluded that the employer had no legal duty to control the terminated employee's conduct (id. at 89).

Similarly, in Martino v Stolzman (18 NY3d 905 [2012]), we applied the foregoing principles of D'Amico to social hosts, ruling that such hosts owe no duty to protect third persons from a guest who becomes intoxicated on and then drives from a premises controlled by the hosts (id. at 908).  Careful, too, was our approach in Stiver v Good & Fair Carting & Moving, Inc. (9 NY3d 253 [2007]), in which we concluded that the inspector of a motor vehicle involved in an accident attributable the mechanical failure of that vehicle has no duty to third parties to properly inspect that automobile (see id. at 255-257).  We were likewise circumspect in Hamilton (96 NY2d 222), wherein we concluded that the defendant-handgun manufacturers did not owe "a duty [to the plaintiffs, who were relatives of people killed by handguns,] to exercise reasonable care in the marketing and distribution of the handguns they manufacture"(id. at 230-231).

warn the resident of the adverse effects of the medication that had been prescribed to her, we acknowledged the plaintiff's citations to foreign authorities imposing a duty on a treating physician in favor of unidentified members of the public to warn a patient of the adverse effects of prescribed medication on the safe operation of an automobile (see Purdy, 72 NY2d at 9-10).  In concluding there that the defendant-physician bore no duty to the general public to warn the resident of the dangers of driving given her medical condition, we noted that such doctor

> "was not [the resident's] treating physician, and therefore was under no legal obligation to warn [the resident] of possible dangers involved in activities in which she chose to engage off the premises of the facility. Nor[, we added,] ha[d] [the] plaintiff demonstrated that [the resident's] impaired driving ability was attributable to any medication prescribed to her by [the physician] without appropriate warnings" (id. at 10).

Our failure in Purdy to foreclose the prospect that a treating physician who does not warn a patient of the dangers of operating a motor vehicle in the face of a certain medical condition could be held accountable for that omission by a member of the general public logically left open the possibility that we could one day recognize such a duty.

This is an instance in which defendants' "relationship with . . . the tortfeasor . . . place[d] [them] in the best position to protect against the risk of harm" (Hamilton, 96 NY2d at 233), and the balancing of factors such as the expectations of

the parties and society in general, the proliferation of claims,

and public policies affecting the duty proposed herein (see

id. at 232) tilts in favor of establishing a duty running from

defendants to plaintiffs under the facts alleged in this case.

> In formulating duty,
>
> "[v]arious factors . . . have been given conscious or unconscious weight, including convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, [and] the moral blame attached to the wrongdoer. . . . Changing social conditions lead constantly to the recognition of new duties[, and] [n]o better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists" (Prosser and Keaton, Torts § 54 at 359 [5th ed 1984] [footnotes omitted]).

Here, put simply, to take the affirmative step of

administering the medication at issue without warning Walsh about

the disorienting effect of those drugs was to create a peril

affecting every motorist in Walsh's vicinity.  Defendants are the

only ones who could have provided a proper warning of the effects

of that medication.  Consequently, on the facts alleged, we

conclude that defendants had a duty to plaintiffs to warn Walsh

that the drugs administered to her impaired her ability to safely

operate an automobile.[4]

---

[4]    There is support for our conclusion in other jurisdictions.  In Taylor v Smith (892 So2d 887 [Ala 2004]), the Supreme Court of Alabama collected cases from seven jurisdictions imposing a duty on physicians for the benefit of nonpatient members of the driving public in support of its conclusion that

---

"the duty of care owed by the director of a methadone-treatment center to his patients extends to third-party motorists who are injured in a foreseeable automobile accident with the patient that results from the director's administration of methadone" (id. at 897; see id. at 893-894, citing McKenzie v Hawai'i Permanente Med. Group, 98 Haw 296, 309, 47 P3d 1209, 1222 [2002] [ruling that a physician "owes a duty to non-patient third parties" to warn patients of possible adverse effects of prescribed medication on their ability to safely operate a motor vehicle, "where the circumstances are such that the reasonable patient could not have been expected to be aware of the risk without the physician's warning"]; Joy v Eastern Maine Med. Ctr., 529 A2d 1364, 1365-1366 [Me 1987] [concluding that a physician who treated a patient by placing a patch over one of the patient's eyes owed a duty to motorists to warn the patient against driving while wearing the patch]; Welke v Kuzilla, 144 Mich App 245, 252, 375 NW2d 403, 406 [1985] [determining that a physician who injected a patient with an "unknown substance" owed a duty to a third-party motorist "within the scope of foreseeable risk, by virtue of (the physician's) special relationship with (the patient)"]; Wilschinsky v Medina, 108 NM 511, 514-515, 775 P2d 713, 716-717 [1989] [concluding that physicians who inject a patient "with drugs known to affect judgment and driving ability" have "a duty to the driving public"]; Zavalas v State Dept. of Corr., 124 Or App 166, 171, 861 P2d 1026, 1028 [1993], denying review 319 Or 150, 877 P2d 86 [1994] [rejecting the contention "that a physician has no duty to third parties ... who claim that the physician's negligent treatment of a patient was the foreseeable cause of their harm"]; Gooden v Tips, 651 SW2d 364, 369 [Tex App 1983] ["under proper facts, a physician can owe a duty to use reasonable care to protect the driving public where the physician's negligence in diagnosis or treatment of his patient contributes to plaintiff's injuries"]; Schuster v Altenberg, 144 Wis2d 223, 239-240, 424 NW2d 159, 166 [1988] [rejecting the contention "that a psychotherapist (has no) duty to warn third parties . . . ."]). The Taylor court also relied on a case from an eighth jurisdiction, which distinguished " 'a mere failure to warn' " from an affirmative act of failing to take proper precautions where the physician has " 'administer[ed] a drug which, when combined with other drugs or alcohol, may severely impair the patient' "(id. at 894, quoting Cheeks v Dorsey, 846 So2d 1169, 1173 [Fla 4th Dist Ct App 2003], denying review 859 So2d 513 [Fla 2003] [emphases removed]). Similarly, here, we have recognized a duty of care running from a physician

to third parties where the physician fails to warn his or her patient of potential physical impairments caused by a drug the physician has *administered*, rather than *merely prescribed*, to the patient.

Moreover, our own canvas has revealed that at least eight other jurisdictions appear to have recognized a duty running from a physician past his or her patient to the general public to warn the patient of the possible adverse effects of medication administered or treatment rendered to the patient by the physician (see Medina v Hochberg, 465 Mass 102, 107-108, 987 NE2d 1206, 1211 [2013] [acknowledging that the Supreme Judicial Court of Massachusetts had previously "concluded that a physician may be liable to a third party for failing to warn his or her patient of the known side effects of medication prescribed by the physician that might affect the patient's ability to drive a motor vehicle"]; Hardee v Bio-Medical Applications of South Carolina, Inc., 370 SC 511, 516, 636 SE2d 629, 631-632 [2006] ["a medical provider who provides treatment which it knows may have detrimental effects on a patient's capacities and abilities owes a duty to prevent harm to patients and to reasonably foreseeable third parties by warning the patient of the attendant risks and effects before administering the treatment"]; Burroughs v Magee, 118 SW3d 323, 333 [Tenn 2003] [holding, under the facts of that case, that the defendant-physician "owed a duty of care (to third-party motorists) to warn (a patient of the physician) of the possible adverse effect of . . . two prescribed drugs on (the patient's) ability to safely operate a motor vehicle"]; Hoehn v United States, 217 F Supp 2d 39, 41, 48-49 [DDC 2002] [deeming viable a claim that "a hospital or physician owe(s) a duty to the general public . . . to (warn) a heavily medicated patient . . . about the danger of driving"]; Osborne v United States, 211 W Va 667, 669, 567 SE2d 677, 679 [2002] [recognizing that West Virginia law permits a third party to bring a cause of action against a health care provider for foreseeable injuries that were proximately caused by the health care provider's negligent treatment of a tortfeasor patient]; Cram v Howell, 680 NE2d 1096, 1098 [Ind 1997] [concluding the defendant-physician had "a duty of care to take reasonable precautions in monitoring, releasing, and warning his patient for the protection of unknown third persons potentially jeopardized by the patient's driving upon leaving the physician's office" where the physician allegedly administered to the patient certain immunizations or vaccinations that caused the patient to experience "episodes of loss of consciousness"]; Myers v Quesenberry, 144 Cal App 3d 888, 890,

C.

        Our conclusion with respect to the duty owed in this
case is accompanied by three observations.  First, the "cost" of
the duty imposed upon physicians and hospitals should be a small
one: where a medical provider administers to a patient medication
that impairs or could impair the patient's ability to safely
operate an automobile, the medical provider need do no more than
simply warn that patient of those dangers.  It is already the
function of a physician to advise the patient of the risks and
possible side effects of prescribed medication (see Wolfgruber v
Upjohn Co., 52 NY2d 768, 770 [1980], affg 72 AD2d 59, 61 [4th
Dept 1979] ["Since nonmedical consumers are legally precluded
from 'self-prescribing' prescription drugs, the physician's
function is to evaluate a patient's needs, assess the risks and

---

894, 193 Cal Rptr 733 [Ct App 4th Dist 1983] [observing, in the
context of concluding that "liability may be imposed against two
physicians for negligently failing to warn their patient of the
foreseeable and dangerous consequences of engaging in certain
conduct which proximately caused injuries to (the) plaintiff, a
third person," that "(w)hen a physician furnishes medicine
causing drowsiness, he should warn his patient not to drive or
engage in other activities which are likely to cause injury"];
Kaiser v Suburban Transp. Sys., 65 Wash2d 461, 464, 398 P2d 14,
16 [1965], mod on other grounds 65 Wash2d 461, 401 P2d 350 [1965]
[concluding that the question whether the defendant-doctor was
negligent in failing to warn the patient-bus driver that a
prescribed drug could cause drowsiness was for a trier of fact]).
We note, however, that our decision herein is not grounded in
those foreign authorities inasmuch as our result is the product
not of "vote counting" but of our independent balancing of
factors including the expectations of the parties and of society,
the proliferation of claims, and public policies affecting the
duty we now recognize (see Hamilton, 96 NY2d at 232).

benefits of available drugs and then prescribe a drug, advising the patient of its risks and possible side effects"]; see also Martin v Hacker, 83 NY2d 1, 9 [1993] [discussing the duty of a prescription drug manufacturer to caution against a drug's side effects by giving adequate warning to the prescribing physician, who "acts as an 'informed intermediary' . . . between the manufacturer and the patient"]).  Our decision herein imposes no additional obligation on a physician who administers prescribed medication.[5]  Rather, we merely extend the scope of persons to whom the physician may be responsible for failing to fulfill that responsibility.

Second, much as we are empowered to identify the duty articulated herein, it is within our authority to clarify how that obligation may be met.  In that vein we reiterate that defendants and those similarly situated may comply with the duty recognized herein merely by advising one to whom such medication is administered of the dangers of that medication.  Indeed, this case is not about *preventing Walsh from leaving the Hospital*, but ensuring that *when Walsh left the Hospital*, she was *properly warned about the effects of the medication administered to her*.

_____

[5]     With respect to the minimal "cost" arising from the duty imposed herein, we note that warnings that prescribed medication impairs or could impair the patient's ability to safely operate an automobile are commonly administered when filling a prescription at a pharmacy, and there is no reason why a medical provider cannot take a similar, simple prophylactic measure.

Third, our decision herein should not be construed as an erosion of the prevailing principle that courts should proceed cautiously and carefully in recognizing a duty of care.  We have previously noted that, "[w]hile the temptation is always great to provide a form of relief to one who has suffered, . . . the law cannot provide a remedy for every injury incurred" (Albala v City of New York, 54 NY2d 269, 274 [1981]).  In other words, we have said that "[n]ot all mistakes . . . result in liability" (McNulty, 100 NY2d at 232).  This decision does not reflect a retreat from those principles.

## III.

We now turn to the remaining issue on appeal, which pertains to the part of plaintiffs' cross motion seeking leave to serve an amended complaint.  That request was based on plaintiffs' desire to add a cause of action for negligence against defendants based on plaintiffs' theory that defendants negligently caused Walsh to become "medically intoxicated and cognitively impaired," and that Walsh caused the accident because of that impairment.

As a general rule, "leave to amend a pleading should be freely granted in the absence of prejudice to the nonmoving party where the amendment is not patently lacking in merit . . . , and the decision whether to grant leave to amend a complaint is committed to the sound discretion of the court" (Pink v Ricci, 100 AD3d 1446, 1448 [4th Dept 2012] [internal quotation marks

omitted]; see CPLR 3025 [b]; <u>Edenwald Contr. Co. v City of New York</u>, 60 NY2d 957, 959 [1983]).  "A complaint sounds in medical malpractice rather than ordinary negligence where the challenged conduct constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician to a particular patient" (1B NY PJI3d 2:150, at 46 [2015]; see <u>Weiner v Lenox Hill Hosp.</u>, 88 NY2d 784, 788 [1996] ["(A) claim sounds in medical malpractice when the challenged conduct constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician.  By contrast, when the gravamen of the complaint is not negligence in furnishing medical treatment to a patient, but the hospital's failure in fulfilling a different duty, the claim sounds in negligence"] [internal quotation marks and citation omitted]).  Inasmuch as the "medical intoxication" of which plaintiffs complain in the proposed new cause of action bears a substantial relationship to the medical treatment administered by defendants, we conclude that plaintiffs' claims against defendants sound in medical malpractice, rather than in negligence.  Consequently, the part of the cross motion seeking leave to serve an amended complaint asserting a cause of action sounding in negligence was properly denied inasmuch as that proposed cause of action lacks merit.[6]

---

[6]     We make a brief procedural point here.  Plaintiffs appeal to this Court from an Appellate Division order that affirmed a Supreme Court judgment dismissing the complaint.  This

Accordingly, the order of the Appellate Division should be modified, without costs, by denying the motions of the Island Medical defendants and the Hospital to dismiss the complaint and, as so modified, affirmed.

---

Court may review the propriety of the denial of plaintiffs' cross motion seeking leave to serve an amended complaint (see Oakes v Patel, 20 NY3d 633, 644-645 [2013]).  However, we do not address the motion for consolidation, which was denied as academic below. This Court is reinstating the complaint, so the request for consolidation is no longer academic and may be raised again at Supreme Court.

Davis v South Nassau Communities Hospital

No. 163

STEIN, J. (dissenting):

The majority precipitously holds that medical professionals working in a hospital emergency room owe a duty of care to a non-patient member of the general public, requiring medical professionals who administer medication that may affect a patient's driving ability to warn the patient -- for the benefit of a third-party motorist -- that he or she should not operate a motor vehicle upon discharge. Because I vehemently disagree that a duty running from a physician to a non-patient should be recognized under the circumstances presented here, I would reaffirm our long-standing precedent holding that a physician's duty of care does not extend beyond the patient to the community at large, a result that is, I believe, mandated by any considered weighing of the societal interests involved. I, therefore, dissent.

I.

I will begin with a recitation of the facts giving rise to this action as recounted in the complaint -- which must be accepted as true on this CPLR 3211 motion (see Leon v Martinez, 84 NY2d 83, 87-88 [1994]) -- and as supplemented by plaintiffs' documentary submissions to the trial court. One morning in March

- 1 -

2009, non-party Lorraine Walsh visited the emergency room of defendant South Nassau Communities Hospital (the Hospital), complaining of severe internal pain.  During intake, Walsh informed emergency room staff that she had arrived at the Hospital by car, but she did not specify whether she was the driver of the vehicle.  Thereafter, Walsh was examined by defendants Dr. Regina E. Hammock and Christine DeLuca (a physician's assistant), both of whom were employed by defendant Island Medical Physicians, P.C.  Because Walsh informed the medical care providers that she was allergic to morphine, she was administered Dilaudid and Ativan, intravenously, a few minutes after 11:07 a.m.  According to plaintiffs' expert, Dr. Alan Schechter, Dilaudid is an opioid narcotic painkiller and Ativan is a benzodiazepine drug used, among other things, as a muscle relaxant, a sedative, and to treat anxiety.  In Dr. Schechter's opinion, any emergency room physician administering these narcotic medications should be aware that they can impair a patient's ability to drive, and the standard of care in the medical community requires that physicians warn their patients accordingly.

Walsh was discharged, and she left the Hospital at 12:30 p.m., over one hour after the administration of Dilaudid and Ativan.  Shortly thereafter, Walsh crossed a double yellow line while operating her vehicle, striking an oncoming bus driven by plaintiff Edwin Davis.  In a subsequent action commenced by

Walsh against defendants Hammock, DeLuca, and the Hospital, Walsh claimed that the medications she was administered rendered her "unconscious for a period of time" and caused or contributed to the accident.

Thereafter, Davis -- and his wife, derivatively -- commenced the instant action to recover damages for Davis's personal injuries, asserting causes of action sounding in medical malpractice and negligent hiring and training of medical personnel against Hammock, DeLuca, and Island Medical Physicians, P.C. (collectively the Island Medical defendants), as well as the Hospital. Plaintiffs alleged that defendants committed medical malpractice by releasing Walsh from the Hospital "in severe pain, a state of disorientation, under the influence of the [administered drugs]" and without providing proper instructions or "arranging her a safe method of travel home."

After joinder of issue, the Hospital and the Island Medical defendants moved to dismiss the complaint, asserting that plaintiffs had failed to state a cause of action for medical malpractice because the complaint did not plead the existence of a cognizable duty of care inasmuch as there was no allegation of a physician-patient relationship between Davis and defendants. Plaintiffs opposed the motion to dismiss and cross-moved for, among other things, leave to amend the complaint to add a cause of action sounding in simple negligence, arguing that defendants owed Davis a duty of care based on their administration of

medication to Walsh and their allegedly negligent discharge of her from the Hospital.

Supreme Court, as relevant here, granted defendants' motions to dismiss the complaint for failure to state a cause of action, and denied that branch of plaintiffs' cross motion that sought leave to amend the complaint to add a negligence claim (2012 NY Slip Op 31969[U] [Sup Ct, Nassau County 2012]).  The court concluded that there was no basis for the proposed amendment because there was no duty running from defendants to non-patient Davis.  The Appellate Division affirmed (119 AD3d 512, 513 [2d Dept 2014]), and we subsequently granted plaintiffs leave to appeal (24 NY3d 905 [2014]).

II.

As the majority recognizes, the threshold issue in any negligence or malpractice action is whether the defendant owed the plaintiff a legally recognized duty of care (see McNulty v City of New York, 100 NY2d 227, 232 [2003]; Hamilton v Beretta U.S.A. Corp., 96 NY2d 222, 232-233 [2001]).  The question of whether and to whom a duty is owed "is a legal one for the courts to resolve, taking into account 'common concepts of morality, logic and consideration of the social consequences of imposing the duty'" (McNulty, 100 NY2d at 232, quoting Tenuto v Lederle Labs., Div. of Am. Cyanamid Co., 90 NY2d 606, 612 [1997]).  When conducting this analysis, "[d]espite often sympathetic facts in a particular case before them, courts must be mindful of the

precedential, and consequential, future effects of their rulings, and 'limit the legal consequences of wrongs to a controllable degree'" (Lauer v City of New York, 95 NY2d 95, 100 [2000], quoting Tobin v Grossman, 24 NY2d 609, 619 [1969]).

We have repeatedly emphasized that the "foreseeability of harm does not define duty" (532 Madison Ave. Gourmet Foods v Finlandia Ctr., 96 NY2d 280, 289 [2001]; see Eiseman v State of New York, 70 NY2d 175, 187 [1987]; Pulka v Edelman, 40 NY2d 781, 785 [1976]); rather it "merely determines the scope of the duty once it is determined to exist" (Hamilton, 96 NY2d at 232). Consequently, "[a]bsent a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm" (532 Madison Ave. Gourmet Foods, 96 NY2d at 289). "This restriction is necessary to avoid exposing defendants to unlimited liability to an indeterminate class of persons conceivably injured by any negligence in a defendant's act" (id.; see Hamilton, 96 NY2d at 232; Eiseman, 70 NY2d at 187). Thus, the foreseeability of Walsh experiencing side-effects from the medications administered to her by defendants and causing an accident with her motor vehicle does not resolve the question of whether defendants may be held liable to plaintiffs in this case.

III.

Plaintiffs assert, and the majority concludes, that recognition of a duty under the circumstances here is merely an

extension of our existing precedent concerning the scope of a physician's duty.  I disagree.  To the contrary, our case law compels the conclusion that defendants owed Davis no duty of care to warn or prevent Walsh from driving because Davis was an unidentified and unknown stranger to defendants' physician-patient relationship with Walsh.

In Eiseman v State of New York, a prison physician completed a health form required for an inmate to be admitted into a college program upon his release from incarceration (70 NY2d at 187).  The physician failed to note that the inmate had a history of addiction and mental illness and, after acceptance and enrollment at the college, the inmate committed heinous crimes against several of his peers (see id. at 180-183).  In the subsequent negligence action, we acknowledged that, although the relevant form did not require the physician to disclose the inmate's history, in completing the form, the physician nevertheless "owed a duty of care to his patient and to persons he knew or reasonably should have known were relying on him for this service to his patient" -- i.e., the college (id. at 188 [emphasis added]).  Yet, in recognizing the possibility that a limited duty might be owed by a physician to a non-patient, we held that the physician did not "undertake a duty to the community at large," and we were careful to limit the object of such a potential duty to a specific identified individual or entity who the physician knew was relying on his or her services

to the patient (id.).

The following year, in Purdy v Public Adm'r of County of Westchester, this Court was presented with the question of whether defendants, a health-related living facility and its admitting physician, owed a duty to a member of the public requiring them to prevent or warn a resident -- 73-year-old Emily Shaw, who had a medical condition that made her susceptible to fainting and blackouts -- from driving (72 NY2d 1, 6 [1988]). We recognized in Purdy that "there exist special circumstances in which there is sufficient authority and ability to control the conduct of third persons that we have identified a duty to do so," such as where there is a "relationship between [the] defendant and a third person whose actions expose [the] plaintiff to harm such as would require the defendant to attempt to control the third person's conduct; or a relationship between the defendant and plaintiff requiring [the] defendant to protect the plaintiff from the conduct of others" (id. at 8). However, we held that the defendants in Purdy had no duty to the plaintiff third party to prevent Shaw from driving because the facility lacked "the necessary authority or ability to exercise . . . control over Shaw's conduct so as to give rise to a duty on their part to protect [the] plaintiff -- a member of the general public" (id. at 8-9). With respect to the plaintiff's duty to warn theory, we acknowledged that other jurisdictions have held that a treating physician's relationship to a patient could be

sufficient to impose a duty running to members of the public to warn the patient of the adverse effects of medication on the ability to drive. However, we noted that, in New York, "[a] physician's duty of care is ordinarily one owed to his or her patient" and not to the community at large (id. at 9-10). In any event, because the defendant physician was not Shaw's treating physician and there was no evidence that any medication prescribed by the physician contributed to the accident, we held that no duty was established.[1]

By contrast, in Tenuto v Lederle Labs., Div. of Am. Cyanamid Co., we concluded that a special relationship existed between the non-patient parents of an infant and the infant's physician such that a duty was owed by the physician to the parents (90 NY2d at 611-612). There, the plaintiff parents presented their infant to her physician for the second dose of an oral poliomyelitis vaccine and, although it was known to the medical community that such vaccine presented a risk of transmittal to the parents, the physician did not warn the

---

[1] Although we noted the existence of pertinent out-of-state case law cited by plaintiff in support of a duty in Purdy v Public Adm'r of County of Westchester, we did not implicitly or explicitly approve of it (72 NY2d 1, 9-10 [1988]). Indeed, because we found that case law to be inapplicable to the facts as presented there, we had no occasion to determine whether it was consistent with governing principles of tort law in New York (see id.). Furthermore, as the majority concedes, out-of-state authority does not govern the disposition of this appeal or our determination of whether a duty exists under these circumstances (see maj. op. at 17 n 4).

parents of that risk or explain how to avoid it (see id. at 610-611).  The infant's father contracted the poliomyelitis virus and commenced an action against the physician.  We held that the parents' complaint sufficiently alleged that the physician owed them a duty of care to warn of the risk, noting that

> "[t]he relation of a physician to his patient and the immediate family is one of the highest trust.  On account of his scientific knowledge and his peculiar relation, an attending physician is, in a certain sense, in custody of a patient afflicted with infectious or contagious disease.  And he owes a duty to those who are ignorant of such disease, and who by reason of family ties, or otherwise, are liable to be brought in contact with the patient, to instruct and advise . . . them as to the character of the disease"

(id. at 613 [emphasis added] [internal quotation marks, emphasis, and citations omitted]).  We also explained that a duty was cognizable under those circumstances because the physician's treatment "necessarily implicate[d] protection of household members or other identified persons foreseeably at risk because of a relationship with the patient, whom the doctor [knew] or should [have] know[n] may [have] suffer[ed] harm by relying on prudent performance of that medical service" (id. [emphasis added]).  In other words, we recognized a duty in Tenuto only because the plaintiffs there were "within a determinate and identified class -- immediate family members -- whose relationships to the person acted upon have traditionally been recognized as a means of extending and yet limiting the scope of

liability for injuries caused by a party's negligent acts or omissions" (id. at 614 [emphasis added]).  Because there was a special relationship "triangulated" between the plaintiffs, the physician, and the patient in light of the fact that "the physician [was] a pediatrician engaged by the parents to provide medical services to their infant, and whose services, by necessity, require[d] advising the patient's parents," our extension of a physician's duty to a non-patient was careful and circumscribed (id. [emphasis added]).

To the extent, if any, that our decision in Tenuto could be read to permit the expansion of a physician's duty to a member of the general public, we clarified the limits of our holding a few years later, in McNulty v City of New York (100 NY2d at 227).  In McNulty, the Court refused to extend a physician's duty to the friend of a patient being treated for contagious meningitis, even though the friend accompanied the patient to the hospital and directly inquired of two physicians whether she was at risk and should be treated in light of her close contact with the patient.  In so holding, we clarified -- again -- that our holding in Tenuto was a very narrow one that relied on the special relationship between the parties and the physician's awareness of the parents' reliance on his services to the infant plaintiff, combined with the fact that the physician's treatment created the risk of harm (see id. at 233).  We cautioned that, in the absence of such a convergence of factors,

New York courts should be "reluctant to expand a doctor's duty of care to a patient to encompass nonpatients," in part due to the "critical concern . . . that a recognition of a duty would render doctors liable to a prohibitive number of possible plaintiffs" (id. at 232).

The rule of law that emerges from this line of cases is easily discerned.  In New York, a physician's duty to a patient, and the corresponding liability, may be extended beyond the patient only to someone who is both a readily identifiable third party of a definable class, usually a family member, and who the physician knew or should have known could be injured by the physician's affirmative creation of a risk of harm through his or her treatment of the patient (see McNulty, 100 NY2d at 233-234; Cohen v Cabrini Med. Ctr., 94 NY2d 639, 642-644 [2000]; Eiseman, 70 NY2d at 188).  I am not aware of anything -- and the majority makes no attempt to identify anything -- indicating that this clear rule has become so unworkable that the significant redefinition of the scope of a physician's duty adopted by the majority is warranted.  Under a reasoned application of our precedent to the facts of this case, it is evident that defendants owed no legal duty to Davis -- or any other member of the public who may have come into contact with, and been harmed by, Walsh after her discharge -- to warn Walsh against, or prevent her from, driving (see McNulty, 100 NY2d at 233-234; Cohen, 94 NY2d at 642-644; Eiseman, 70 NY2d at 188; Rebollal v

Payne, 145 AD2d 617, 617-618 [2d Dept 1988]).

        The majority's contrary conclusion and imposition of a
duty to warn Walsh for the benefit of Davis and other motorists
is inimical to the principles enunciated in Purdy, Eiseman,
Tenuto, and McNulty because, while defendants arguably created a
risk of harm by affirmatively giving Walsh medications that
impaired her ability to drive, Davis is not a member of an
identifiable and readily limited class.[2]  Inexplicably, the
majority acknowledges that we have consistently "declined to
recognize a duty to an indeterminate, faceless, and ultimately
prohibitively large class of plaintiffs" (maj. op. at 8), but
then proceeds to recognize just such a duty in this case without
articulating any clearly defined class to which this new duty
runs.  Under the Court's decision in this case, the class of

_____

    [2]  To the extent plaintiffs claim that defendants had a duty
to actually prevent Walsh from leaving the hospital -- as opposed
to merely issuing a warning against driving -- defendants did not
have "sufficient authority and ability to control" Walsh's
conduct to give rise to such a duty (Purdy, 72 NY2d at 8-9; see
Kowalski v St. Francis Hosp. & Health Ctrs., 21 NY3d 480, 486
[2013]; D'Amico v Christie, 71 NY2d 76, 88 [1987]; Conboy v
Mogeloff, 172 AD2d 912, 913 [3d Dept 1991], lv denied 78 NY2d 862
[1991]; Waqshall v Waqshall, 148 AD2d 445, 447 [2d Dept 1989],
appeal dismissed and lv denied 74 NY2d 781 [1989]; Cartier v Long
Is. Coll. Hosp., 111 AD2d 894, 895 [2d Dept 1985]).  Moreover,
there is clearly no relationship between defendants and Davis --
who were completely unknown to one another prior to the accident
-- that required defendants to protect Davis from Walsh's conduct
or to consider the effects of their treatment of Walsh on him
(compare Tenuto v Lederle Labs., Div. of Am. Cyanamid Co., 90
NY2d 90 NY2d 606, 614 [1997]).  The majority recognizes the
absence of sufficient control here by limiting their holding to a
duty to warn.

                          - 12 -

potential plaintiffs cannot be logically restricted or identified.

Ultimately, by imposing liability here, the majority eviscerates the precept that a physician generally owes a duty of care only to the patient, not to the community at large. The majority justifies its otherwise unsupportable position by pointing out that the harm to Davis here was foreseeable (which, as set forth above, is not dispositive) and by asserting that "our calculus is such that we assign the responsibility of care to the person or entity that can most effectively fulfill that obligation at the lowest cost" (maj. op. at 7). While it is true that we have stated in other contexts that a "'key' consideration critical to the existence of a duty . . . is 'that the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm,'" we have also recognized in the next breath that, even where the defendant is best positioned to prevent harm, a duty should be imposed only where "the specter of limitless liability is not present because the class of potential plaintiffs to whom the duty is owed is circumscribed by the relationship" (Matter of New York City Asbestos Litig., 5 NY3d 486, 494 [2005], quoting Hamilton, 96 NY2d at 233). "The law demands that the equation be balanced; that the damaged plaintiff be able to point the finger of responsibility at a defendant owing, not a general duty to society, but a specific duty to [the

plaintiff]" (<u>Johnson v Jamaica Hosp.</u>, 62 NY2d 523, 527 [1984]).
The majority blatantly disregards this well-settled and crucial
limitation on the recognition of a duty.  Indeed, the duty it now
adopts is not specific to Davis or based on any relationship he
had with defendants or Walsh; rather, the duty imposed by the
majority upon defendants here extends to any motorist,
pedestrian, bicyclist, or other injured member of the public who
comes into contact with any of defendants' innumerable patients.
However, our jurisprudence, both in general and in the specific
context of physician-owed duties, has repeatedly rejected the
imposition of a duty that will have such far-reaching and
unmanageable consequences (see e.g. <u>McNulty</u>, 100 NY2d at 232;
<u>Hamilton</u>, 96 NY2d at 234; <u>Strauss v Belle Realty Co.</u>, 65 NY2d
399, 402 [1985] [it is the responsibility of the courts when
fixing duty to "to protect against crushing exposure to
liability"]).  The majority's claim that it is not retreating
from our heretofore cautious approach to recognizing new scopes
of duties rings hollow in the face of its analysis and holding
demonstrating otherwise.

IV.

        Even if I were able to accept the premise that a
logically defined duty could be extended to a non-patient third
party under our prior decisions, this Court is obligated to
balance certain relevant factors before making such a
determination.  These factors include "the reasonable

expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability" (Palka v Servicemaster Mgt. Servs. Corp., 83 NY2d 579, 586 [1994]; see Hamilton, 96 NY2d at 232-233).  A thorough and careful consideration of these factors -- an analysis that is conspicuously absent from the majority's decision -- compels me to conclude that the societal costs of imposing upon physicians a duty to non-patient members of the general public greatly outweigh the potential benefits of permitting such individuals to recover against physicians for their injuries (see Matter of New York City Asbestos Litig., 5 NY3d at 493 ["any extension of the scope of duty must be tailored to reflect accurately the extent that its social benefits outweigh its costs"]; Hamilton, 96 NY2d at 232).

(A)

First, the extension of a duty under the circumstances presented here does not conform with the expectations of the parties or of society in general.  Until now, it was unlikely that physicians would have expected to be held accountable to members of the community at large for decisions arising out of their treatment of an individual patient.  This is because the duty of care owed to a patient arises out of the personal, private, and individualized relationship between the two parties.

By contrast, physicians have no relationship with unidentified members of the public and cannot foresee or predict with whom their patients will come into contact.  In addition, while patients certainly expect their medical providers to properly advise them of the risks and side-effects associated with medications that are administered to them, patients have no reason to expect that their doctor's advice to them could give rise to a cause of action against the physician in favor of a person with whom neither the physician nor the patient had prior contact.  Thus, this factor of the duty analysis militates against the finding of a duty.

(B)

Second, it is indisputable that a medical professional who administers medication that is likely to impair a patient's ability to drive owes a duty of care to the patient that may require the medical professional to warn the patient of potential risks and side-effects of the medication, including advice regarding whether it is safe for the patient to operate a motor vehicle (see generally Nestorowich v Ricotta, 97 NY2d 393, 398 [2002]; Wolfgruber v Upjohn Co., 72 AD2d 59, 61 [4th Dept 1979], affd 52 NY2d 768 [1980]).  It is precisely because the physician already has a duty to undertake the action that plaintiffs claim will prevent future harm -- i.e., to warn the patient -- that the majority's expansion of the scope of a physician's liability to every member of the public will not create any additional social

benefit at all.  Nor will the imposition of a duty in favor of third parties render it more or less likely that the <u>patient</u> -- with whom the ultimate decision to drive rests -- will heed a medical provider's warning not to operate a motor vehicle.  That is, the extension of a duty under these circumstances will have little or no deterrent effect on the conduct which actually results in the harm -- i.e., the operation of a motor vehicle by a person under the influence of medication -- and there is little preventative benefit to be gained by the majority's expansion of liability (<u>see</u> <u>Matter of New York City Asbestos Litig.</u>, 5 NY3d at 495).

(C)

Third, while the majority's departure from our precedent yields no appreciable benefit, the extension of a physician's duty to warn a patient to a third party comes at a heavy cost, both financially and socially.  As for the latter, in my view, it is readily foreseeable that the imposition of a duty and the corresponding expansion of liability to include non-patients will adversely interfere with the physician-patient relationship.  It can hardly be disputed that, as this Court has previously stated, the relationship between a physician and patient "operates and flourishes in an atmosphere of transcendent trust and confidence and is infused with fiduciary obligations" (<u>Aufrichtig v Lowell</u>, 85 NY2d 540, 546 [1995]).  As a fiduciary, a physician generally owes a duty of undivided loyalty to the

patient, and the paramount consideration in a physician's course of treatment must, therefore, be the patient's health and well-being.  Although a physician has a duty, generally, to warn patients of the potential for a medication to, among other things, interfere with driving ability, the physician's decision in specific situations regarding which side-effects to explain or warnings to give with particular medications is, undoubtedly, one that is made in the exercise of professional judgment, based on the physician's weighing of the likelihood of danger or quantum of risk and a determination of the individual patient's interests.  Extending a physician's duty beyond the patient to a boundless pool of potential plaintiffs, creates a very real risk that a physician will be conflicted when deciding whether, and to what extent, medication should be administered and under what circumstances specific warnings should be issued.  In my view,

> "[t]he consequences of this conflict for decisions regarding patient care are not insignificant.  A physician whose attention is diverted from the patient to the effects of his advice on unknown persons who could be harmed by the patient's future conduct 'may, understandably, become less concerned about the particular requirements of any given patient, and more concerned with protecting himself or herself from lawsuits by the potentially vast number of person[s] who will interact with and may fall victim to that patient's conduct outside of the treatment setting'"

(Jarmie v Troncale, 306 Conn 578, 611-612, 50 A3d 802, 821 [2012], quoting Coombes v Florio, 450 Mass 182, 211, 877 NE2d 567, 587 [2007] [Cordy, J., dissenting]).

For example, a physician may become overly cautious in prescribing necessary medications so as to avoid potential liability.  Similarly, instead of giving only those warnings a physician truly believes to be warranted in a particular case, the physician may inundate a patient with excessive detail about potential, but unlikely, risks associated with a medication in order to insulate him- or herself from liability, thus distracting the patient from the most significant risks and side-effects.  Worse yet, these warnings may devolve into a general practice of physicians handing out pro-forma lists of potential side-effects that patients will cursorily sign prior to the administration of medications, ultimately resulting in fewer educated patients and less informed consent.  While a physician may be ethically bound to refrain from allowing considerations of liability to influence his or her treatment decisions, it is naive, at best, to assume that the immeasurable liability that will result from the imposition of a duty owing to countless non-patients will have no impact upon a physician's exercise of professional judgment.

The duty adopted by the majority also implicates concerns regarding physician-patient confidentiality (see CPLR 4504; Education Law § 6530) and, in my view, is unworkable on a practical level.  For instance, where a patient who was administered medication without a warning against driving defaults in a legal action brought by an injured third party, or

decides not to shift blame to the physician, the physician-
patient privilege would bar disclosure to the injured party of
the patient's medical records and communications with the
physician (see Arons v Jutkowitz, 9 NY3d 393, 409 [2007];
Dillenbeck v Hess, 73 NY2d 278, 287-88 [1989]).  An injured
third-party will, therefore, be unable to obtain the information
necessary to establish or obtain a remedy for a breach of the
physician's purported duty to that party.  Conversely, where an
injured third-party manages to state a claim despite a lack of
cooperation from the patient, a physician's inability to disclose
privileged information concerning the patient may hamstring the
physician's ability to defend against the claim.  Significantly,
the majority does not address the rationality of imposing a duty
upon a physician where a breach of that duty cannot be proven or
disproved -- absent a patient's cooperation -- without
encouraging violations of the physician-patient privilege or
requiring courts to delve into whether intrusion into the
privilege and a patient's privacy is warranted.  In that regard,
the likelihood of interference with the physician-patient
relationship weighs heavily against extending a physician's duty
to a non-patient in this context.

                              (D)

          Fourth, the expansion of a physician's liability to
include all members of the public injured by a patient's
operation of a motor vehicle while under the influence of

medication will likely have a substantial financial impact on the medical profession and the availability of competent medical care throughout the state.  Where, as here, "recognition of a duty would render doctors liable to a prohibitive number of possible plaintiffs" (McNulty, 100 NY2d at 232), such a duty will assuredly affect the cost and availability of medical care, as physicians will face an influx of litigation and rising malpractice insurance premiums.  Injured non-patients will have every incentive to pursue litigation against physicians due to the availability of insurance coverage and, even if the majority of physicians successfully defeat such claims by demonstrating compliance with their already-existing duty to warn a patient where such a warning is warranted, the added cost of entering into litigation of these claims, either through summary judgment motions or trial, will take its toll.

Moreover, scenarios implicating a physician's duty of care owed to members of the general public regarding their treatment of patients are endless, and the majority's finding of a duty here presents a slippery slope at the bottom of which a physician's ultimate liability could be staggering due to both the countless number of potential plaintiffs, as well as the myriad of ways in which liability may arise.  Following the majority's holding to its logical conclusion, a physician can arguably now be held liable, not just where a medication impairs driving ability due to its impact on a patient's state of

wakefulness, but also where a medication causes any other physical malady, for example, a severe stomach ache that distracts a driver or a rash of itchiness that causes a driver to release the steering wheel and lose control. The public as a whole gains little benefit from imposing upon physicians a scope of liability as vast as the one the majority now endorses. The societal cost, on the other hand, is significant.

(E)

Finally, plaintiffs lament that it is unfair to allow Walsh to recover against defendants for her own injuries if they failed to warn her not to drive, while concomitantly precluding Davis from obtaining the same recovery for his injuries. However, there is nothing inconsistent about allowing a patient, but not a stranger, to recover against a medical professional for a negligent failure to warn the patient. "Any conclusion regarding inconsistent outcomes must involve a comparison between two parties that stand in the same relationship to another party, and patients and injured third persons do not stand in the same relationship to health care providers" (Jarmie, 306 Conn. at 600-601). Moreover, in almost all instances in which courts are asked to establish a duty, the courts must draw the line somewhere. As former Chief Judge Kaye eloquently stated,

> "[t]his sort of line-drawing -- a
> policy-laden determination reflecting a
> balance of competing concerns -- is
> invariably difficult not only because it
> looks in part to an unknowable future but
> also because it is in a sense arbitrary, hard

to explain to the person just on the other side of the line, especially when grievous injury is alleged.  Human compassion and rigorous logic resist the exercise.  If this person can recover, why not the next?  Yet line-drawing is necessary because, in determining responsibility for negligent acts, common-law courts also must look beyond the immediate facts and take into account the larger principles at stake"

(McNulty, 100 NY2d at 234-235 [Ch. J. Kaye, concurring]).

Although I am sympathetic to plaintiffs and "it may seem that there should be a remedy for every wrong, this is an ideal limited perforce by the realities of this world" (Tobin v Grossman, 24 NY2d at 619; see Albala v City of New York, 54 NY2d 269, 274 [1981]).  For, "[a] line must be drawn between the competing policy considerations of providing a remedy to everyone who is injured and of extending exposure to tort liability almost without limit" (De Angelis v Lutheran Med. Ctr., 58 NY2d 1053, 1055 [1983]).  To extend the duty here is to subject physicians to potentially crushing liability attenuated from the common expectations of all involved.

In addition, in many cases, motorists who are injured as a result of a physician's negligent failure to warn a patient of the possible side-effects from the administration of medication are not entirely without recompense because they may be covered by their own motor vehicle or health insurance, or can pursue recovery against the patient/driver who directly caused the injury.  While an injured party may occasionally be deprived of compensation by the absence of a duty in scenarios like the

one here, I cannot agree with the majority that the possible benefits to be gained by creating a liability owing from physicians to every person who might potentially be injured by a patient -- benefits which are not identified by the majority -- outweigh the costs.

V.

For all these reasons, I would decline to extend a physician's duty to warn a patient about the effects of medication on his or her driving ability, beyond the duty already owed to the patient, to the community at large. My conclusion is consistent with, and compelled by, our precedent cautioning against the expansion of a physician's scope of liability, which confines a physician's duty to patients and specifically-identified persons who the doctor knows or has reason to know are relying upon the patient's treatment and who are harmed by the physician's affirmative creation of a risk. Adherence to this rule and our prior case law is necessary to avoid the imposition of a duty in cases like this, where the absence of a definable class of potential plaintiffs opens the door to limitless liability that will unduly interfere with the physician-patient relationship and increase the costs of medical care throughout the state, all while producing minimal societal benefit. It is, therefore, my hope that the legislature -- which has long expressed its concern regarding the impact of the costs of medical malpractice insurance and litigation on the affordability

and availability of medical care -- will carefully consider
whether the majority's holding is consistent with New York's
statutory medical malpractice schemes and the aims of tort
recovery in New York.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order modified, without costs, by denying the motions of the
Island Medical Physicians, P.C. defendants and of defendant South
Nassau Communities Hospital to dismiss the complaint and, as so
modified, affirmed.  Opinion by Judge Fahey.  Chief Judge Lippman
and Judges Pigott and Rivera concur.  Judge Stein dissents and
votes to affirm in an opinion in which Judge Abdus-Salaam
concurs.


Decided December 16, 2015